# EXHIBIT A

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

5  JING XU,                    )Case No.:  5:23-cv-05510-VKD
                               )
6                 Plaintiff,   )
                               )
7                              )
                               )
8        vs.                   )
                               )
9                              )
                               )
10 BETTER MORTGAGE CORPORATION, a   )
   California corporation, and THE  )
11 MONEY SOURCE, INC., a New York   )
   corporation,                )
12                             )
                  Defendants.  )
13 _____  )

14

15

16                    DEPOSITION

17                       OF

18                     JING XU

19

20           Friday, November 22, 2024

21

22               Pages 1 - 112

23

24

25     Reported By:  Kathryn M. Charpentier, CSR 13319

1

```
 1                    A P P E A R A N C E S

 2

     Appearing for Plaintiff Jing Xu:
 3
              Terra Law, LLP
 4            BY:  BRECK E. MILDE, ATTORNEY AT LAW
              333 West Santa Clara Street, Suite 620
 5            San Jose, California 95113
              (408) 299-1200
 6            bmilde@terralaw.com

 7   Appearing for Defendant The Money Source, Inc.:

 8            Hall Griffin, LLP
              BY:  VALERIE J. SCHRATZ, ATTORNEY AT LAW
 9            1851 East 1st Street, Floor 10
              Santa Ana, California 92705
10            (714) 918-7000
              vschratz@hallgriffin.com
11
     Appearing for Defendant Better Mortgage Corporation:
12
              Lippes Mathias, LLP
13            (Appearing via videoconference)
              BY:  BERJ KHOREN PARSEGHIAN, ATTORNEY AT LAW
14            420 Lexington Avenue, Room 2005
              New York, New York 10170
15            (332) 345-4500
              bparseghian@lippes.com
16

17   Also Present:

18            Trevor Bennett, Videographer

19
                      ---o0o---
20

21

22

23

24

25

                                                              2
```

```
 1                          INDEX

 2     EXAMINATION                               PAGE

 3     By Ms. Schratz                           7, 108

 4     By Mr. Parseghian                          69

 5
                          ---o0o---
 6
                          EXHIBITS
 7
       MARKED              DESCRIPTION           PAGE
 8
       Exhibit 101 Notice of deposition (6 pages)   12
 9
       Exhibit 102 Notice of Servicing Transfer     20
10              (TMS000022)

11     Exhibit 103 Consumer Credit Score Disclosure  21
                (TMS000389)
12
       Exhibit 104 Notice Concerning The Furnishing  25
13              Of Negative Information to Consumer
                Reporting Agency (TMS000401)
14
       Exhibit 105 Note Loan No. 1483638414          25
15              (TMS000117)

16     Exhibit 106 Deed of Trust (TMS000297 - 314)   26

17     Exhibit 107 Setting up your TMS account       27
                (XU_00007 - 9)
18
       Exhibit 108 TMS Mortgage Statement            29
19              (TMS000023 - 24)

20     Exhibit 109 TMS welcome e-mail (TMS000031)     30

21     Exhibit 110 TMS welcome e-mail (TMS000032)     30

22     Exhibit 111 TMS payment confirmation           32

23     Exhibit 112 TMS billing statement (TMS0000033) 34

24

25     (Exhibit continued on next page.)
```

```
1                      INDEX

2    EXAMINATION                                 PAGE

3    Exhibit 113 TMS mortgage statement (TMS0000034 - 35)  35

4    Exhibit 114 TMS 11/5/21 letter 2 pages)     36

5    Exhibit 115 TMS billing statement (TMS0000049)  37

6    Exhibit 116 TMS mortgage statement (TMS0000041 - 42)  38

7    Exhibit 117 Chase e-mail (XU_00052 - 53)    39

8    Exhibit 118 Dispute summary information (2 pages)  46

9    Exhibit 119 Dispute summary information (2 pages)  49

10   Exhibit 120 Bank of America loan estimate   53
             (XU_00057 - 59)
11
     Exhibit 121 E-mail string (XU_00054 - 55)   54
12
     Exhibit 122 Notice of Action Taken (XU_00045 - 47)  57
13
     Exhibit 123 Contract to Buy and Sell Real Estate  61
14           (XU_00022 - 44)

15   Exhibit 124 5/14/22 e-mail (XU_00056)       65

16   Exhibit 125 9/12/24 Northpointe Bank letter  69
             (6 pages)
17
     Exhibit 126 Consent to Receive Electronic Loan  75
18           Documents (2 pages)

19   Exhibit 127 Consent to Receive Electronic Loan  92
             Documents (2 pages)
20
     Exhibit 128 12/4/21 TMS e-mail (2 pages)    92
21
     Exhibit 129 10/13/21 e-mail (BMC002743)     93
22
     Exhibit 130 Closing Disclosure (6 pages)    94
23
     Exhibit 131 2/18/22 TransUnion correspondence  95
24           (XU_00066 - 72)

25   (Exhibit continued on next page.)
```

                                                         4

1                          INDEX

2     EXAMINATION                                      PAGE

3     Exhibit 132 3/29/22 Better Mortgage correspondence   96
                 (XU_00010 - 15)
4
      Exhibit 133 4/1/22 e-mail (XU_00002)              97
5
      Exhibit 134 IRS Record of Account (BMC000824 - 34)  99
6
      Exhibit 135 2018-19 Delinquent tax due (2 pages)  101
7
      Exhibit 136 2024-25 Tax bill detail (1 page)      102
8
      Exhibit 137 5/21 - 6/21 Delinquent tax due (2 pages) 102
9
      Exhibit 138 24-25 Secured tax bill detail (3 pages)  104
10
      Exhibit 139 Supplemental property tax bill for    106
11                July 1, 2021 through June 30, 2022.

12    Exhibit 140 24-25 Secured tax bill detail (1 pages)  106

13                        ---o0o---

14         QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

15                      PAGE   LINE

16                       84     17

17                      108      5

18                      108    131

19                        ---o0o---

20

21

22

23

24

25

                                                          5

1              BE IT REMEMBERED, that on Friday, November 22, 2024

2        commencing at the hour of 10:15 a.m., at 18 South 2nd

3        Street, San Jose, California 95113, before me, KATHRYN

4          CHARPENTIER, a Certified Shorthand Reporter, there

5                        personally appeared:

6              THE VIDEOGRAPHER:  My name is Trevor Bennett.

7        I'm contracted by Network Deposition Services

8        Incorporated.  I am not financially interested in this

9        action nor am I a relative or employee of any of the

10                attorneys of any of the parties.

11             Today is Friday, November 22nd.  The time is

12       10:15 a.m. Pacific.  This deposition is taken at

13       18 South 2nd Street, San Jose, California 95113.  The

14         name of the case is Jing Xu versus Better Mortgage

15       Corporation filed in the United States District Court,

16       Northern District of California, San Jose Division, Case

17                     Number 523-CV-05510-VKD.

18             This is the video-recorded deposition of Jing

19         Xu.  The attorney taking this deposition is Valerie

20                            Schratz.

21             Would all present please identify themselves

22                  beginning with the deponent.

23                     THE WITNESS:  Jing Xu.

24             MR. MILDE:  Breck Milde, attorney for plaintiff

25       Jing Xu.

                                                                        6

```
 1            MS. SCHRATZ:  Valerie Schratz, attorney for the

 2    Defendant The Money Source, Inc.

 3            MR. PARSEGHIAN:  Berg Parseghian of Lippes

 4    Mathias, LLP on behalf of Better Mortgage Corporation.

 5            THE VIDEOGRAPHER:  The court reporter today is    10:16:50

 6    Kathryn Charpentier with Network Deposition Services

 7    Incorporated.  Would the reporter please swear in the

 8    witness.

 9                        JING XU,

10    plaintiff in the above-entitled court and case, who,

11    being duly affirmed to testify truthfully by the

12    Certified Shorthand Reporter was examined and testified

13    as hereinafter set forth:

14                  EXAMINATION BY MS. SCHRATZ

15       Q.   Good morning, Mr. Xu.                             10:17:21

16       A.   Good morning.

17       Q.   Can you please, again, state your name and then

18    spell it?

19       A.   Yes.  Jing Xu.  First name, J-i-n-g.  Last name

20    X-u.

21       Q.   Have you ever used any other names?

22       A.   No.

23       Q.   Have you ever had your deposition taken before?

24       A.   No.

25       Q.   I'm going to go over just a few basic ground     10:17:38
```

7

1    rules today.  This is not meant to be very

2    uncomfortable.

3          Basically, you just took an oath.  And I want

4    you to understand that that oath is the same that you

5    would take in a court of law and you're required to       10:17:50

6    testify truthfully.

7          There is a court reporter here who will be

8    taking down everything that we say.  So there's a few

9    basic ground rules to make sure that she's able to do

10   her job and we can get a really clear record.  One of     10:18:04

11   those things is make sure that we speak one at a time.

12   It becomes very difficult in conversation because you

13   may know what the end of my question is going to be, and

14   you are probably right, and the temptation is to answer

15   it before I'm done.  It makes it very hard for her to do  10:18:20

16   her job.  So if you can try and be very careful to make

17   sure I'm done before you start answering and I will also

18   try to do the same, to make sure before you're done

19   before I start asking.

20         Things will happen.  We may end up talking over     10:18:37

21   each other.  She'll ask for clarification if she needs

22   it.  It's something that happens all the time, so don't

23   stress about it.

24         Following today's session you will be provided

25   an opportunity to review the transcript.  And you may be  10:18:49

                                                                          8

1    able to make correction to that.  However, I would

2    caution you that any substantive changes that you make

3    to the transcript could be used against you later

4    regarding credibility.

5          Now, prior to giving me any answers today I        10:19:05

6    want to make sure that you understand a question.  So if

7    you need a clarification, if you don't understand

8    something, if you didn't hear me, please ask me to

9    repeat it.  Happy to do that.  If you do answer my

10   question or the questions of other counsel I'm going to  10:19:22

11   assume that you understood; is that fair?

12       A.   Yes.

13       Q.   Additionally, we're entitled to your best

14   recollection and we're entitled to things like

15   estimates.  But we don't want you to guess.  So I'm      10:19:37

16   going to give you an example.

17          For instance, if I asked you when a particular

18   event occurred you might remember the exact date, but

19   that's probably unlikely, you might remember it was in

20   the summer of a particular year.  So just give us your   10:19:52

21   best recollection.  But I don't want you to just guess.

22          Additionally, we do have a camera here.  But

23   the court reporter can't take down gestures.  So if

24   you're trying to say something like, The fish was this

25   big (indicating) I may ask you to describe how wide      10:20:10

9

1    apart your hands are so that that ends up in the written

2    record.

3        A.   Sounds good.

4        Q.   Make sure you speak fairly clearly and loudly

5    so that everything can get picked up with the video as    10:20:22

6    well.  I may ask you to repeat some things.  Please

7    don't be offended.  It's just all to make sure that we

8    get everything needed.  This is a small space; there's a

9    little echo, so it's going to be a little bit difficult.

10   But we'll get through it.                                 10:20:37

11       A.   Yes.  English is my second language, so I may

12   also ask you to repeat if I cannot understand.  Also,

13   feel free to ask me to repeat if I'm not clear.

14       Q.   Excellent.  I will not be offended if that

15   happens.                                                  10:20:55

16            Is there any health or physical reason why you

17   cannot not be deposed today?

18       A.   No.

19       Q.   Have you taken any drugs or alcohol or other

20   substances that would affect your ability to testify     10:21:04

21   truthfully today?

22       A.   No.

23       Q.   Additionally, this is not a marathon.  If you

24   need a break we can take lots of breaks today as needed.

25   I would just ask if there's a question pending we answer  10:21:16

                                                                      10

1   that question before we take a break.  Just let us know

2   if you need to stretch your legs, use the restroom, get

3   water, whatever.  Again, this is not a marathon.  It's

4   not meant to be gruelling.

5       A.   Sounds good.                                   10:21:31

6       Q.   Excellent.  Do you have any questions so far

7   for me about this process?

8       A.   No.  Very clear.  Thank for the explanation.

9       Q.   You're welcome.  Did you have any discussions

10  with anyone other than your attorney to prepare for       10:21:42

11  today's deposition?

12      A.   No.

13      Q.   Did you review any documents to prepare for

14  today's deposition?

15      A.   Yes, my complaint filed before.               10:21:55

16      Q.   Anything else?

17      A.   Yeah, maybe my e-mail.  It has been two years,

18  so I'm trying to remember myself.

19      Q.   And why did you review the complaint?

20      A.   It's just too long.  I just want to make sure I 10:22:20

21  remember the dates or the information.  Complaint, for

22  me, it's like a summary for the situation.  Yes, it's

23  essential.

24      Q.   All right.  I'm going to start with what we're

25  going to mark as Exhibit 101.                           10:22:45

                                                                11

```
 1              (Defendants' Exhibit 101 marked.)

 2   BY MS. SCHRATZ:

 3       Q.   This document is entitled "Notice of Deposition

 4   of Jing Xu and Request For Production of Documents."

 5   Have you seen this document before?              10:23:16

 6       A.   Yes, I believe so.  I don't know whether it's

 7   exactly the same thing.  But I think I've seen a similar

 8   thing before.

 9       Q.   If you could turn to page 4, this document

10   lists on pages 4 and 5 19 different categories of   10:23:39

11   documents that were requested to be produced; did you

12   review these document categories before today?

13       A.   No, I don't think so.  But, as I said, I saw

14   something similar before.  I'm not sure whether it's the

15   exact same thing.                                  10:24:05

16       Q.   Okay.  For instance, on page 4, Number 1 of the

17   documents to be produced says, "A copy of your current

18   credit report including your current FICO credit score."

19   Have you done a search of your records to see if you

20   have any documents responsive to that request?     10:24:24

21       A.   Yes.  I just did a refinance for one of my

22   homes and I got a report.  But it's not a complete

23   report.  It's just showing the three credits from the

24   three bureaus.

25       Q.   And did you bring a copy of that credit report  10:24:47
```

1  with you today?

2      A.    Yes.

3      Q.    Do you have any other documents to produce

4  today?  That would be great.

5      A.    This is the cover page.                      10:25:27

6      Q.    I'll see if I can get some copies of these.

7          MR. MILDE:  Yeah, this is the first I've seen

8  them myself.

9          THE WITNESS:  Sorry.  I didn't let you know

10 this morning.                                           10:25:42

11 BY MS. SCHRATZ:

12     Q.    Do you have any other documents to produce

13 today that are responsive to these requests for

14 documents?

15     A.    No.                                           10:25:49

16     Q.    Several of these requests request copies of

17 your credit report.  Do you have any other copies of

18 your credit reports?

19     A.    No.

20     Q.    Have you done a search of your records to see 10:26:03

21 if you have any copies of your credit report besides the

22 one that you just produced?

23     A.    The is the only one that I've found.

24     Q.    Have you tried to obtain a copy of your credit

25 report any time recently?                               10:26:17

                                                                13

1     A.   No.  I just requested that.

2          Q.   If you could review these categories and let me

3     know are there any other documents that you are aware of

4     that you have access to that are listed here that you

5     have not already produced.                              10:26:59

6          A.   Yeah, I think we already provided everything I

7     have previously.  Other than this, this is the only

8     other thing that I have.

9          Q.   Make sure you review page 5 as well.

10         A.   Yes.                                           10:27:20

11         Q.   I just want to get a little bit of background

12    information about you.

13              What is your date of birth?

14         A.   October 24, 1965.

15         Q.   And what is your current residence address?   10:28:03

16         A.   3637 Ramona Circle, R-a-m-o-n-a Circle, Palo

17    Alto.

18         Q.   And how long have you lived at that address?

19         A.   Since 2021.

20         Q.   And is that also your current mailing address? 10:28:33

21         A.   Yes.

22         Q.   Has that been your mailing address since 2021?

23         A.   Yes.

24         Q.   And what phone number have you used to

25    communicate with the defendants in this action, Better   10:28:53

                                                                    14

1    Mortgage or The Money Source?

2        A.   (812) 606-4509.

3        Q.   Have you used any other phone numbers to

4    communicate with those two parties?

5        A.   No.                                          10:29:13

6        Q.   What the highest level of education you have

7    obtained?

8        A.   Ph.D.

9        Q.   And where did you obtain your Ph.D.?

10       A.   University of Texas at Arlington.            10:29:28

11       Q.   And when did you obtain that Ph.D.?

12       A.   It's from 2011 to 2016.

13       Q.   And what concentration or degree was that

14   Ph.D.?

15       A.   "Concentration" you mean major?              10:29:46

16       Q.   Yes.

17       A.   Computer science.

18       Q.   Do you hold any professional licenses or

19   certificates?

20       A.   No.                                          10:30:12

21       Q.   Do you have any professional real estate

22   experience or training?

23       A.   No.

24       Q.   Are you currently employed?

25       A.   Yes.                                         10:30:20

                                                                15

```
 1        Q.   Who is your employer?

 2        A.   Google.

 3        Q.   And how long have you worked for Google?

 4        A.   Since 2016.

 5        Q.   What is the nature of your employment?        10:30:28

 6        A.   I'm a software engineer.

 7        Q.   Is that also your title?

 8        A.   Yes.

 9        Q.   Do you have any military experience?

10        A.   No.                                           10:30:51

11        Q.   Are you married?

12        A.   Yes.

13        Q.   What is your spouse's name?

14        A.   Yashi Zhang, first name Y-a-s-h-i.  Last name

15   Z-h-a-n-g.                                              10:31:02

16        Q.   And is your spouse employed?

17        A.   Not right now.

18        Q.   Has she been employed at any time since 2021?

19        A.   No.

20        Q.   Does she have any professional licenses or    10:31:14

21   certificates?

22        A.   No.

23        Q.   And does she have any professional real estate

24   training or experience?

25        A.   No.                                           10:31:25
```

16

1      Q.   Do you currently own any rental properties?

2      A.   Yes.

3      Q.   How many rental properties do you own?

4      A.   Three.

5      Q.   What are the addresses of those properties?    10:31:38

6      A.   The first one is 99 East Middlefield Road

7   Mountain View, California 94043.  The second one is 405

8   Wakwa Avenue, W-a-k-w-a, South Bend, Indiana.  The third

9   one, 83280 Waldron Drive, W-a-l-d-r-o-n Drive.  The city

10  is Lawton, L-a-w-t-o-n, Michigan.                       10:32:35

11     Q.   I'm surprised you remembered all those.

12     A.   I'm surprised too.

13     Q.   Let's start with Middlefield in Mountain View.

14  When did you become an owner of that property?

15     A.   2017.                                            10:33:00

16     Q.   And has that been a rental property the entire

17  time you've owned?

18     A.   No.  It was our primary residence at the

19  beginning.

20     Q.   And during what time frame did you live there?    10:33:20

21     A.   From 2017 to 2021.

22     Q.   So you moved straight from there to your

23  current house?

24     A.   Yes.

25     Q.   And regarding the property in South Bend,         10:33:35

                                                              17

1    Indiana, when did you become the owner of that property?

2        A.   2022.

3        Q.   And has that always been a rental property?

4        A.   Yes.

5        Q.   And the address in Lawton, Michigan, when did    10:33:54

6    you become the owner of that property?

7        A.   2023.

8        Q.   And has that always been a rental property?

9        A.   Yes.

10       Q.   Do you currently have mortgage or loans    10:34:13

11   associated with each of those properties?

12       A.   Yes.

13       Q.   Have you owned any other rental properties in

14   the last three years?

15       A.   No.                                              10:34:43

16       Q.   Let's talk about the Ramona property in Palo

17   Alto.  When did you become the owner of that property?

18       A.   2021.

19       Q.   And did you purchase that property?

20       A.   Yes, with loan.                                  10:35:04

21       Q.   And do you recall the purchase price?

22       A.   Yeah.

23       Q.   What was that?

24       A.   Almost 270.  I think it was 2698.

25       Q.   So 2,698,000?                                    10:35:24

18

1       A.   Yeah.

2       Q.   And you said you obtained a loan as part of the

3    purchase of that property?

4       A.   Yes.

5       Q.   And was that loan through PNC Mortgage?          10:35:38

6       A.   Yes, I can't remember exactly.  But it sounds

7    right.

8       Q.   And do you recall what the original principal

9    amount of that loan was?

10      A.   Almost 2 million.  Yes, close to 2 million.      10:35:59

11      Q.   And do you recall what the interest rate was

12   for that loan?

13      A.   I cannot remember exactly.  2.75, something

14   like that.

15      Q.   If I told you some public records say it was     10:36:29

16   2.875 --

17      A.   Yeah, that's true.

18      Q.   At some point did you refinance that original

19   purchase loan?

20      A.   Yes.                                             10:36:42

21      Q.   Did you refinance that loan with a new loan

22   from Better Mortgage?

23      A.   Yes.

24      Q.   Was that in or around September of 2021?

25      A.   Yes.                                             10:36:54

                                                                      19

1        Q.   Why did you refinance the loan at that time?

2        A.   To lower the monthly payment.  The rate was

3    lower.

4        Q.   And do you recall what the rate was that you

5    obtained from Better Mortgage on that refinance loan?    10:37:33

6        A.   Yeah, 2.75.

7             MS. SCHRATZ:  I'm going to show you what we're

8    going to mark as Exhibit 102.

9             (Defendants' Exhibit 102 marked.)

10   BY MS. SCHRATZ:

11       Q.   Do you recall viewing this document when you

12   were working on that refinance for that loan with Better

13   Mortgage?

14       A.   Yes.

15       Q.   And based on this form it says that the current   10:38:34

16   servicer of this loan was Better Mortgage Corporation

17   about halfway down the page; do you see that?

18       A.   Yes.

19       Q.   And did you understand that that was true at

20   the time that you looked at this document and obtained    10:38:49

21   this loan?

22       A.   Wait a second.  This is not what I saw -- yeah,

23   I should correct myself.  I don't think I saw this

24   before.  This is the -- no, I don't think I saw this

25   before.                                                   10:39:23

1        Q.    Do you recall being informed at the time that

2    you originated this loan that the servicer at the

3    origination was Better Mortgage Corporation?

4        A.    Yeah.  I remember, yeah.

5        Q.    And at some point were you informed that          10:39:37

6    servicing was transferring from Better Mortgage to The

7    Money Source?

8        A.    Yeah, I think I saw an e-mail.  But I don't

9    know whether I saw this -- if it is from e-mail or mail,

10   I don't know.  But, yeah, I know the transfer from          10:39:56

11   Better Mortgage to Money Source from -- I don't know if

12   an e-mail.

13       Q.    And this says that the servicing would be

14   transferred from Better Mortgage to The Money Source

15   effective November 2021; is that your understanding of     10:40:12

16   when the servicing transferred?

17       A.    Yes.

18            (Defendants' Exhibit 103 marked.)

19   BY MS. SCHRATZ:

20       Q.    Next I'd like to hand you what we're going to     10:40:33

21   mark as Exhibit 103; do you recall seeing this document

22   as part of your refinance paperwork as part of the

23   refinance paperwork with Better Mortgage?

24       A.    I don't remember -- yeah, if I signed here,

25   then, yes.                                                  10:40:57

                                                                     21

1      Q.   You probably looked at a lot of documents.

2      A.   Yes.

3      Q.   And I believe you just mentioned -- is that

4    your signature on the bottom of the page?

5      A.   Yes.                                         10:41:09

6      Q.   And it looks like it has a handwritten date of

7    September 23, 2021.

8      A.   Hmm-mmm.

9      Q.   And do you believe you signed it on that date?

10     A.   Yes.                                         10:41:18

11     Q.   And you recall if you read this document at the

12   time you signed it?

13     A.   Yeah, I saw a lot of documents.  I'm not

14   exactly sure.  But I see my signature here.  It is my

15   signature there.  It's true.                        10:41:53

16     Q.   If you look on page 2 of this document it lists

17   three of the credit reporting agencies, a current/most

18   recent credit score for each and key factors adversely

19   affecting your credit score for each.

20          Based upon your understanding was this         10:42:30

21   information accurate at the time that you signed this

22   document?

23          MR. MILDE:  Objection.  It's compound.  It's

24   also vague and ambiguous.  But the

25   information -- everything on the whole page?          10:42:39

                                                                22

```
 1              MS. SCHRATZ:  Yes.

 2              MR. MILDE:  So take your time.  She's asking

 3    you -- well, I'm not to going say what she asked you.

 4              THE WITNESS:  You mean on the second page,

 5    schedule scoring information?                    10:42:58

 6    BY MS. SCHRATZ:

 7       Q.  Yes.  Is that information accurate as you

 8    understood it at the time?  Take your time.

 9              MR. MILDE:  It also calls for speculation about

10    what the credit bureaus are reporting.          10:43:08

11              You can answer the question.

12              THE WITNESS:  Should I answer?

13              MR. MILDE:  You can answer to the best of your

14    ability.

15              THE WITNESS:  Okay.  Yeah, it looks right.  My  10:43:29

16    impression was that my score was around 750, 60.  Yeah,

17    that looks right.

18    BY MS. SCHRATZ:

19       Q.  And under the Equifax header it mentions, Key

20    factors adversely affecting your credit score.  If you  10:43:46

21    can take at look at those and let me know if those four

22    items there were accurate as of your understanding at

23    that time.

24       A.  It looks right.

25       Q.  And same question as to the four factors under  10:44:10
```

1    the TransUnion heading?

2          MR. MILDE:  I'm not clear what you're asking

3    him.  Just agree with what's here?

4          MS. SCHRATZ:  Is this accurate to his

5    understanding at that time?                            10:44:33

6          MR. MILDE:  Objection.  Calls for speculation.

7    It's vague and ambiguous.  This is a credit bureau

8    report.  I don't think he's competent to testify as to

9    what their process is.

10          You can answer the question.                    10:44:54

11          THE WITNESS:  This time since most recent

12    account open is too short.  I don't know which company

13    it refers to.  If it refers to the mortgage, then it's

14    true.  But if this is for the refinance -- the context

15    is not clear.  So I don't know what this is referring  10:45:57

16    to.  If it refers to the initial mortgage, the account

17    opening, then, yes.  But I cannot remember any other

18    account open before that.

19    BY MS. SCHRATZ:

20       Q.   And if you would also look at the key factors  10:46:20

21    below the Experian heading --

22          MR. MILDE:  Same objections.

23    BY MS. SCHRATZ:

24       Q.   -- same question.

25       A.   Yeah, I'm not 100 percent sure.  But it       10:46:33

                                                                24

```
 1    looks -- it should be right.

 2              (Defendants' Exhibit 104 marked.)

 3    BY MS. SCHRATZ:

 4        Q.   The next document that we'll look at is going

 5    to be labeled Exhibit 104; and do you recognize this      10:46:57

 6    document as part of the package of loan items for your

 7    refinance with Better Mortgage?

 8        A.   The same as before.  I don't recall exactly.

 9    But I see my signature here.

10        Q.   And it looks like the date is again             10:47:28

11    September 23, 2021.

12        A.   Hmm-mmm.

13        Q.   And do you believe you signed it on that date?

14        A.   Yes.

15        Q.   Do you recall if you read this document before   10:47:36

16    you signed it?

17        A.   I can't recall exactly.  But, yeah, I

18    understand the information.

19        Q.   And at the time you signed this document did

20    you understand that negative credit information could be  10:48:04

21    reported related to this loan?

22              (Witness nods head.)

23              (Defendants' Exhibit 105 marked.)

24    BY MS. SCHRATZ:

25        Q.   This one will be a little more familiar.  This   10:48:35
```

1    will be Exhibit 105; and do you recognize this document

2    as part of your loan documents as part of your refinance

3    with Better Mortgage?

4        A.   It's the same answer as with all the documents.

5    I can't remember this exact number.  But, yes, I also        10:49:22

6    see my signature there, so it should be the one I saw.

7        Q.   The signature on page 3 is the signature that

8    you're talking about?

9        A.   Yes.

10       Q.   One more from that same package you remember.       10:49:47

11           (Defendants' Exhibit 106 marked.)

12           MS. SCHRATZ:  This will be Exhibit 106.

13   BY MS. SCHRATZ:

14       Q.   Take a look at it -- it's quite a long

15   document -- and let me know if you recognize this           10:50:16

16   document and also keep an eye out for signatures.

17       A.   Yes.

18       Q.   If you look at what's showing at page 14 of 15

19   where there's signatures --

20       A.   Yeah, I saw that.                                   10:51:02

21       Q.   -- above where it says your name on that page,

22   is that your signature?

23       A.   Yes.

24       Q.   And also that appears to be your wife's name

25   next to that?                                                10:51:18

26

1      A.   Yes.

2      Q.   Did see her sign this document as well?

3      A.   Yes.

4      Q.   And do you believe you did that on

5   September 23, 2021, which is the date on page 1 of 15?    10:51:28

6      A.   Yes.

7      Q.   We're done with the origination documents.

8           So earlier you mentioned an e-mail that you

9   received.  I'm going to hand you what we're going to

10  mark as Exhibit 107.                                        10:52:22

11          (Defendants' Exhibit 107 marked.)

12  BY MS. SCHRATZ:

13     Q.   Is this a copy of the e-mail you were speaking

14  of earlier?

15     A.   Yes.                                                10:52:35

16     Q.   And this document appears to show an e-mail to

17  you at the e-mail address robertxjys@gmail.com.

18     A.   Yes.

19     Q.   Is that your e-mail?

20     A.   Yes.                                                10:53:01

21     Q.   Do you still have access to that e-mail?

22     A.   Yes.

23     Q.   And this document shows that this e-mail is

24  dated October 17, 2021; do you believe you received this

25  e-mail on that date?                                        10:53:12

27

1      A.   Yes.

2      Q.   And is it your understanding that this e-mail

3   is related to the refinance loan with Better Mortgage

4   that we've been discussing?

5      A.   Yes.                                    10:53:34

6      Q.   Prior to receiving this e-mail had you given

7   any of your personal bank or checking account info to

8   Better Mortgage or anyone else related to this loan?

9      A.   I don't remember.

10      Q.   Prior to receiving this e-mail had you set up    10:54:02

11   automatic payments related to this loan?

12      A.   I don't remember.

13      Q.   Did you take any actions in response to

14   receiving this e-mail?

15      A.   Yes.                                    10:54:27

16      Q.   What did you do?

17      A.   I went to the TMC website and set up an account

18   and provided my bank information, make the initial

19   payment, the first payment, make sure that the

20   information I put there is correct, that it went    10:54:46

21   through.  Yes, that's what I did.

22      Q.   Did you take any other actions in response to

23   receiving this e-mail?

24      A.   I think I just set up the account and made the

25   payments.                                       10:55:15

1        Q.   And when did you take those follow-up actions

2    that you were just talking about?

3        A.   I think late October or early November, around

4    that timeframe.

5        Q.   And before you took those actions had you        10:55:32

6    received anything in the mail from The Money Source

7    regarding this loan?

8        A.   I don't remember.

9        Q.   Keep that 107.  But I'm also going to hand you

10   what we've marked as Exhibit 108.  I have some black and   10:55:52

11   white copies.  And there's also a colored copy.

12           MS. SCHRATZ:  Let's mark this one for the

13   record.

14           (Defendants' Exhibit 108 marked.)

15   BY MS. SCHRATZ:                                            10:56:20

16       Q.   This document purports to be a mortgage

17   statement with a statement date of October 19, 2021.  Do

18   you recall if you received this by U.S. mail around that

19   date?

20       A.   I don't remember.                                10:56:30

21       Q.   Do you believe that you did receive it or do

22   you think maybe you did not?

23           MR. MILDE:  Objection.  Calls for speculation.

24           THE WITNESS:  Should I answer?

25           MR. MILDE:  Sure.                                  10:56:53

29

```
 1              THE WITNESS:  I believe I did not receive it.

 2      BY MS. SCHRATZ:

 3         Q.   Okay.  Do you recall if you ever received any

 4      statements related to this loan from The Money Source

 5      via U.S. mail?                                      10:57:21

 6         A.   I don't remember.

 7              (Defendants' Exhibit 109 marked.)

 8      BY MS. SCHRATZ:

 9         Q.   I'm going to hand you what we'll mark as

10      Exhibit 109.  But do keep 107.  And do you recognize  10:57:59

11      this document?

12         A.   Yes.

13         Q.   What is this document?

14         A.   I think this is after I opened the account in

15      on the website I got a confirmation e-mail.         10:58:32

16         Q.   And do you believe this is a copy of that

17      confirmation e-mail?

18         A.   To be honest, I can't remember exactly.  But I

19      see the e-mail address is mine.  Yeah, I received this

20      e-mail.

21         Q.   And this document says the e-mail was sent on

22      November 3, 2021; does that refresh your recollection

23      about when you went to the TMS website?

24         A.   Yeah.  Early November, it sounds right.

25              (Defendants' Exhibit 110 marked.)         10:59:20
```

                                                             30

```
 1   BY MS. SCHRATZ:

 2       Q.   This next document will be Exhibit 110; and do

 3   you recognize this document?

 4       A.   Yeah, similar to the previous one, I can't

 5   remember the exact date.  But I see the e-mail.  I        10:59:42

 6   should have seen this before.

 7       Q.   And this document also says it was sent

 8   November 3, 2021, same as the prior one; do you see

 9   that?

10       A.   Yes.                                             10:59:55

11       Q.   This document mentions that, You have enrolled

12   in paperless communication.  You have selected the

13   following options:  Periodic billing statements,

14   year-end tax statement, additional correspondence, so

15   on; do you understand that this is a confirmation e-mail  11:00:13

16   based upon the efforts you described earlier about

17   registering items at the TMS website?

18           MR. MILDE:  Objection.  Vague and ambiguous.

19           THE WITNESS:  No.

20   BY MS. SCHRATZ:                                           11:00:32

21       Q.   Do you recall registering on the TMS website

22   for periodic billing statements November 3, 2021?

23       A.   Yeah, maybe -- I don't remember exactly.  But

24   it sounds right.  You already asked about that,

25   paperless communication.                                 11:00:50
```

                                                                                 31

1        MS. SCHRATZ:  We'll mark the next document as

2   Exhibit 111.

3        (Defendants' Exhibit 111 marked.)

4   BY MS. SCHRATZ:

5        Q.   And do you recognize this document?        11:01:24

6        A.   The same as before.  I can't remember exactly.

7   By the address there I should have seen this before.

8        Q.   This document says, This is your confirmation

9   notification that you have successfully submitted a

10  one-time draft request in the amount of $8,153.74 for    11:01:41

11  November 3, 2021.

12       A.   Hmm-mmm.

13       Q.   Do you understand that this document discusses

14  the one-time payment you were discussing earlier?

15       A.   Yes.                                           11:02:03

16       Q.   Did you make any other one-time payments to

17  this loan via the TMS website or portal at any time?

18       A.   No.

19       Q.   Did you set up automatic payments on the TMS

20  website or TMS portal at any time?                       11:02:39

21       MR. MILDE:  Objection.  Asked and answered.

22       You can answer again.

23  BY MS. SCHRATZ:

24       Q.   When did you set up automatic payments?

25       A.   When I set up the loan account.               11:02:50

                                                              32

1       Q.   Did you get any confirmation that you had set

2   up automatic payments?

3       A.   I don't remember.

4       Q.   Do you have any documents to show that you set

5   up automatic payments at that time?                    11:03:02

6       A.   No.

7       Q.   Did anyone else see you set up automatic

8   payments at that time?

9       A.   No.

10       Q.   Did you set up the automatic payments around   11:03:15

11   the same time, the same date as you made the one-time

12   payment?

13       A.   Yes.

14       Q.   Why did you make a one-time payment and set up

15   automatic payments?                                     11:03:41

16       A.   Because I want to make sure the information

17   that I input is correct and the money can go through my

18   bank to the lender.  Once I did that I did automatic

19   payments.

20       Q.   And to your understanding was there any        11:03:58

21   automatic payments withdrawn by The Money Source for

22   this loan?

23       A.   Sorry.  Can you repeat your question?

24       THE REPORTER:  "Question:  And to your

25   understanding was there any automatic payments withdrawn  11:04:00

                                                              33

1    by The Money Source for this loan?"

2           THE WITNESS:  I'm not understanding -- no.

3    BY MS. SCHRATZ:

4        Q.   So do you have any understanding of why not?

5        A.   Right now my understanding is because they          11:04:41

6    didn't let me know when they transferred the account.

7    And also they didn't enable the -- (reporter

8    clarification) -- turn on the auto payment.

9        Q.   And to your understanding why did they not turn

10   on the auto payment?                                          11:05:19

11          MR. MILDE:  Objection.  Calls for speculation.

12          THE WITNESS:  I don't know why.

13          (Defendants' Exhibit 112 marked.)

14   BY MS. SCHRATZ:

15       Q.   Let's take a look at what we'll mark as              11:06:02

16   Exhibit 112; do you recognize this document?

17       A.   Yes.

18       Q.   And what is this document?

19       A.   This is an e-mail notification to my e-mail

20   from TMS to tell me the monthly statement is ready.          11:06:39

21       Q.   And this e-mail is dated November 5, 2021; do

22   you believe you received this e-mail on that date?

23       A.   I think so.

24       Q.   And it mentions your mortgage statement is

25   ready to be viewed online and provides instructions on       11:06:59

34

1    how to view it; did you review your mortgage statement

2    online at that time?

3        A.   I don't remember.

4        Q.   It also mentions to log into your account; do

5    you recall if you logged into your account at that time?  11:07:19

6        A.   I logged into my account before.  But I do not

7    remember if it's, like, around this time or earlier or

8    later.

9            (Defendants' Exhibit 113 marked.)

10   BY MS. SCHRATZ:                                           11:07:57

11       Q.   I'll hand what you we'll mark as Exhibit 113;

12   is it your understanding that this is the mortgage

13   statement that's referenced in that e-mail we were just

14   looking at as Exhibit 112?

15       A.   Yes, that's my understanding, this is a        11:08:11

16   mortgage statement.

17       Q.   Do you recall if you reviewed this mortgage

18   statement at that time?

19       A.   I don't remember.

20       Q.   Do you recall if you've seen this mortgage      11:08:21

21   statement any time before today?

22       A.   I don't remember.

23       Q.   Just looking back at Exhibit 112 it mentioned

24   some instructions to view your statements.

25       A.   Hmm-mmm.                                        11:09:36

35

1        Q.    And the last one there is, Click on documents.

2   Do you recall if you ever logged into your account and

3   clicked on documents?

4        A.    Yeah.

5        Q.    When did you do that?                                    11:09:47

6        A.    That was after I set up my account.  Maybe

7   around after I made my payment or, around -- yes, around

8   that time.

9        Q.    Did you log into your account at any other

10  time?                                                             11:10:12

11       A.    I don't remember.

12             (Defendants' Exhibit 114 marked.)

13  BY MS. SCHRATZ:

14       Q.    I'm handing you what we've marked as

15  Exhibit 114.  This document says -- it's a subject line       11:10:49

16  of "Notice of Mortgage Servicing Transfer" and has a

17  date of November 5, 2021; have you ever seen this

18  document before?

19       A.    No.

20       Q.    This document mentions that, The servicing of      11:11:14

21  your mortgage loan is scheduled to be transferred to

22  Allied Bank effective January 4, 2022.

23             Do you recall being informed at any time that

24  the servicing for this loan was being transferred to

25  Allied Bank?                                                     11:11:37

36

1      A.   No.

2      Q.   Do you have any understanding of this document

3  that's Exhibit 114 was in the documents tab of your

4  online account with The Money Source at any time?

5      A.   No.                                           11:11:53

6      Q.   Do you recall if you ever viewed your account

7  and did or did not see this document?

8      A.   No, I do not remember.

9      Q.   Earlier you had discussed that you logged into

10  your account shortly after you did the set-up, which    11:12:16

11  was, I believe, on November 3rd; is that right?

12     A.   Yes, set-up is on the 3rd.  I made log-in on

13  that date, and maybe one or two days later to track my

14  payment goes through.  Maybe after that I do not

15  remember if I have logged into that.                    11:12:36

16     Q.   During any time that you logged into that

17  log-in with The Money Source did you check the documents

18  tab to see what documents were there?

19     A.   No.

20          MS. SCHRATZ:  I'd like to mark this next        11:13:06

21  document as Number 115.

22          (Defendants' Exhibit 115 marked.)

23  BY MS. SCHRATZ:

24     Q.   And do you recognize this document?

25     A.   Yeah.  This looks similar to the previous one.  11:13:22

                                                                37

1       Q.   This purports to be an e-mail to you with a

2   sent date of December 19, 2021.

3       A.   Hmm-mmm.

4       Q.   Do you believe you received this e-mail on that

5   date?                                              11:13:44

6       A.   Yes.

7       Q.   Did you take any actions in response to

8   receiving this e-mail?

9       A.   No.

10      Q.   Did you click on any of the links in the        11:13:57

11  e-mail?

12      A.   No.

13      Q.   And it mentions that your mortgage statement is

14  ready to be reviewed online.  Did you view your mortgage

15  statement at that time?                             11:14:16

16      A.   I don't think so.

17           (Defendants' Exhibit 116 marked.)

18  BY MS. SCHRATZ:

19      Q.   I'll hand you what we've marked as Exhibit 116.

20  This document says it's a mortgage statement from The    11:14:42

21  Money Source with a statement date of

22  December 16, 2021; have you ever seen this document

23  before?

24      A.   I don't think so.

25           MS. SCHRATZ:  Now would be good time for a       11:15:32

38

November 22, 2024

1    break.

2            MR. MILDE:  Sure.

3            MS. SCHRATZ:  Five minutes.

4            THE VIDEOGRAPHER:  The time is 11:15 a.m.

5    Pacific.  We're off the record.                    11:15:45

6            (Recess.)

7            THE VIDEOGRAPHER:  The time is 11:29 a.m.

8    Pacific.  We are on the record.

9    BY MS. SCHRATZ:

10       Q.   At some point did you learn that there was a   11:30:01

11   negative mark on your credit regarding this loan that

12   we've been discussing today?

13       A.   Yes.

14       Q.   And how did you learn that?

15       A.   I saw an e-mail alert from Chase Bank.  They   11:30:14

16   track my credit score and they sent me an e-mail and

17   told me there's a negative activity, something like

18   that.

19            (Defendants' Exhibit 117 marked.)

20   BY MS. SCHRATZ:

21       Q.   I'm going to hand you what we'll mark as

22   Exhibit 117.  Is this a copy of that e-mail from Chase

23   that you were just discussing?

24       A.   Yes, I believe so.

25       Q.   And this document says that it's got a date on   11:30:51

39

1   it of January 5, 2022; is that the date that you believe

2   that you received that e-mail from Chase?

3       A.   Yes.

4       Q.   What did you do in response to receiving that

5   e-mail, if anything?                                    11:31:05

6       A.   I think I immediately went online account to

7   check what's going on, and I make payment -- I tried to

8   make a payment right away.

9       Q.   And when you say you went to your online

10  account what online account are you speaking of?        11:31:35

11      A.   I don't remember exactly.  But my thought

12  should be it went to TMS portal to make the payment.

13      Q.   And were you able to log onto the TMS portal at

14  that time?

15      A.   I don't recall.  But I think so, yeah.         11:32:05

16      Q.   And you said you tried to make a payment right

17  away.  Were you successful in making that payment?

18      A.   That is part of what I'm trying to remember.  I

19  have one impression that I was in the portal, but I no

20  longer be able to make the payment because the loan     11:32:34

21  already transferred to the -- to be honest, I don't

22  remember who I paid for the due amount, if it was TMS or

23  Allied.  But I definitely tried to make the payment

24  immediately from the source -- I'm trying to say from

25  all the ways I can think of to make the payment.        11:33:23

                                                                40

1      Q.   And were you able to make that payment at that

2    time?

3      A.   Yes, I believe so.  I do not remember whether I

4    was successful at the first try.  But at least I found a

5    way to make the payment.                          11:33:49

6      Q.   If you look back at Exhibit 114 it mentions

7    that the servicing had been transferred to Allied Bank

8    effective January 4, 2022.  Does this refresh your

9    recollection if you were able make that payment to TMS

10   or Allied Bank or somewhere else?                 11:34:27

11     A.   I still cannot remember exactly who I paid to.

12     Q.   Do you recall what amount you paid at that

13   time?

14     A.   I'm not 100 percent sure.  But it should be

15   like two months.                                  11:34:50

16     Q.   Two month's worth of payments?

17     A.   Yeah, two months.  Basically I just paid

18   whatever due.

19     Q.   Did you do anything else in response to

20   receiving this e-mail that we've marked as Exhibit 117?  11:35:11

21     A.   Yes, I think I noticed that negative effect on

22   my credit score.  And also I was trying to do another

23   refinance with Bank of America, so this credit score,

24   like, affect my refinance, so I tried to appeal it.  I

25   contacted with Better Mortgage and TMS through their   11:35:50

41

 1    customer service.  I think I called multiple times, two,

 2    three, four times.  And the reason I called multiple

 3    times is because one of the customer service told me it

 4    was -- yeah, they understand it was their

 5    miscommunication and she will escalate to another          11:36:17

 6    department or some manager and let me wait for a couple

 7    of weeks.

 8           But I didn't hear from them so I called them

 9    again.  But this time maybe a different customer service

10    so they say something different.  They say they will       11:36:36

11    contact me.  And then I think I also called Better

12    Mortgage and TMS and I figured out they will not correct

13    this.

14           Then someone told me I can file an appeal

15    to -- what do you recall it -- financial -- another        11:37:01

16    organization about financial issues.

17           MR. MILDE:  This is kind of turning into a

18    narrative here.  I think she just wanted to know what

19    you did and you've gone on to some length about that.

20    So we'll let her ask you some more questions.             11:37:22

21           THE WITNESS:  Yeah.

22    BY MS. SCHRATZ:

23       Q.   So one of the things you said was that you

24    contacted Better Mortgage.  And how did you attempt to

25    contact them?                                             11:37:38

                                                                42

1          A.    I called customer service.   I think I initially

2     also contacted with the loaner, the one who helped me do

3     the refinance.  And they told me they cannot handle

4     this, let me contact their customer service or like some

5     other department.                                    11:38:00

6          Q.    And how many times did you contact the customer

7     service department with Better Mortgage?

8          A.    I don't remember exactly.   Two times, three

9     times, four times.  Yes, three or four times.

10         Q.    And was this always just via telephone?     11:38:16

11         A.    Yeah, telephone.

12         Q.    And what did your agent from Better Mortgage

13    tell you on these telephone calls, if anything?

14         A.    Yes, one of the agents told me -- after I

15    explained the situation they told me they agreed.  This  11:38:38

16    is their fault; they miscommunicated this, and she will

17    escalate this to her manager or another department.

18    Basically she cannot make the final call here and she

19    let me wait, this is -- one agent told me.

20              And the other one told me it's not -- they just  11:38:58

21    reported the thing.  And think I also talked with her

22    manager.  And the manager said the same thing.  Yes,

23    that's the conversation I remember.

24         Q.    You said you also contacted The Money Source

25    through their customer service?                       11:39:21

                                                                43

1      A.   Yeah, if I remember correctly.

2      Q.   How many times did you contact The Money Source

3   customer service about this?

4      A.   Also more than once.  When I described the

5   conversation, I cannot remember if that conversation is    11:39:41

6   with Better Mortgage or The Money Source, but with one

7   of them.

8      Q.   And when you contacted The Money Source

9   customer service about this issue was it always via

10  telephone?                                                 11:39:57

11     A.   Yes, except the initial e-mail I sent to the

12  loan officer.

13     Q.   What office did you send that initial e-mail

14  to?

15     A.   I think the one who told me to do the            11:40:07

16  refinance, I sent an e-mail to let her know the

17  situation to ask her whether she can help with this

18  situation.

19     Q.   And who was that e-mail sent to?

20     A.   I don't remember her name.  But it was the loan  11:40:21

21  officer that helped me to do the refinance.

22     Q.   So this was your original loan officer?

23     A.   Yeah.

24     Q.   And not an e-mail to Better Mortgage or The

25  Money Source?

44

1        A.    That loan officer is from Better Mortgage.

2        Q.    Okay.  Thank you for clarifying.

3              Did you receive any response to that e-mail to

4    Better Mortgage?

5        A.    You mean sent an e-mail?                        11:40:53

6        Q.    The e-mail you were just speaking of, did you

7    receive a response?

8        A.    Yes.  She told me this is basically out of her

9    responsibility.  I need to talk with someone else.

10       Q.    You also mentioned that someone told you to    11:41:10

11   file an appeal with some financial something.  What was

12   that that you were describing?

13       A.    I think we have some documents here.  I don't

14   remember the name.  But it's financial fair department

15   or something.                                            11:41:42

16       Q.    Is that possibly the Consumer Financial

17   Protection Bureau?

18       A.    Yes, that sounds right.

19       Q.    And how did you contact the Consumer Financial

20   Protection Bureau?

21       A.    Either through e-mail or their online service.

22   I may have filed an appeal on their website or I

23   e-mailed them.  I don't remember.

24       Q.    And when did you do that?

25       A.    After I saw the negative activity.  And after I  11:42:11

45

1    had the conversations with Better Mortgage and The Money

2    Source I realized the customer service cannot help me

3    here.  I need from someone else.  So I do not remember

4    the exact time.  But it should be around February,

5    March.                                                      11:42:44

6         Q.   And that would be in 2022?

7         A.   Yeah, 2022.

8              (Defendants' Exhibit 118 marked.)

9              MS. SCHRATZ:  I'm going to mark this next

10   document as Exhibit 118.  I just noticed there's a          11:43:35

11   circle on this.  So I'm going ensure I get this correct.

12   I'm marking it out.

13             MR. MILDE:  Okay.  Thank you.  This one?

14             MS. SCHRATZ:  Yes.  And if you see another one

15   let me know.                                                11:44:11

16   BY MS. SCHRATZ:

17        Q.   And this is a two-page document; do you

18   recognize this document?

19        A.   Hmm-mmm.

20        Q.   Yes?                                              11:44:56

21        A.   Yes.

22        Q.   And what is that document?

23        A.   The second one is, like, my notes on this case,

24   like, basically the contacts for this case.  And I used

25   this content to appeal.  I think I used this content to     11:45:10

                                                                      46

1    appeal through three bureaus, credit bureaus, and also

2    the finance department.  And for this document I do not

3    remember this submitted to which bureau or which

4    department, but it should be one of them.  Okay.  Okay.

5    Okay.  It's TransUnion.  So it should be my appeal to          11:45:45

6    TransUnion.

7         Q.   And this document says it has a date of

8    submission of January 31, 2022; is that the date that

9    you recall submitting this information to TransUnion?

10        A.   That sounds right.                                   11:45:59

11        Q.   Did you also submit a dispute or an appeal to

12   the other credit reporting agencies?

13        A.   Yes.

14        Q.   Do you have any documentation of that?

15        A.   I have provided all the documents I can find.       11:46:12

16   I think at least for one bureau I appealed online.  But

17   I cannot find the history there.  I think their website

18   either lost that information or they do not have that

19   history tracking.  So I cannot find it.  But I'm sure I

20   did.                                                          11:46:42

21        Q.   And when did you report this to one of the

22   other credit reporting agencies, or more than one?

23        A.   I appealed all three around the same time.  The

24   finance department was later.  But these three around

25   the same time.                                                11:47:00

47

1      Q.    On the first page the last section discusses

2    consumer comment.  Can you review that and tell us what

3    you were trying to convey with that statement?

4           MR. MILDE:  Objection.  This misstates the

5    document.  This seems to be something that was created    11:47:43

6    by TransUnion.  TransUnion is on the first page.

7           But you can answer the question.

8           THE WITNESS:  Yeah, I think when I appealed I

9    left some comment here to try to explain the situation.

10   Yeah, basically I was saying there is the auto payment    11:48:10

11   was disabled by the lender.  And in the e-mail from 1078

12   they mentioned either disable auto payment or transfer

13   my loan, but neither of them happened.  So that's the

14   reason the payment was not paid on time.  So I think it

15   was not my fault.  So I'm requesting to remove that    11:48:49

16   negative mark.

17   BY MS. SCHRATZ:

18     Q.    You said the auto payment was disabled by the

19   lender; what lender are you referring to when you say

20   that?                                                    11:49:06

21     A.    To be honest, I was a little confused, like,

22   Better Mortgage or TMS, what's their relationship.  I

23   tried to refer to both of them.  I don't know who

24   actually is responsible for this.  From my perspective

25   they are both guilty.                                    11:49:31

                                                              48

1      Q.   And did you receive any response to this

2   January 21, 2022 submission?

3      A.   Yes, I think I received a response from

4   the -- basically -- I don't remember I received a

5   response from this bureau or other bureau.  But I          11:49:53

6   received one response from one of the bureaus, yes.

7      Q.   And how did you receive that response?

8      A.   I think through the mail.

9      Q.   And do you recall what the substance of that

10  response was?                                              11:50:25

11     A.   Basically they are saying -- I don't remember

12  exactly.  But basically they are saying it's a late

13  payment.  They do not know all the context here.  They

14  just know it's a late payment received from Better

15  Mortgage or TMS.  If you want to correct this you need     11:50:48

16  to work with them other than the bureau.

17     Q.   And did you do anything in response to

18  receiving that response that you were just discussing?

19     A.   Yes.  I think then I -- I don't remember

20  exactly.  But I made contact with Better Mortgage and      11:51:06

21  The Money Source again and tried to find another

22  customer service to see if I can talk to and settle this

23  and correct this.  And after that I also filed an appeal

24  to the financial department.

25          (Defendants' Exhibit 119 marked.)                  11:52:07

                                                                    49

1    BY MS. SCHRATZ:

2         Q.   I'm handing you what we'll mark as Exhibit 119.

3    This document is similar to the prior one here.  But it

4    has a date submission of March 3, 2022; do you recognize

5    this document?                                            11:52:17

6         A.   Yes.  I think -- well, not -- yes, when I see

7    this I think after I received response from them I tried

8    again.

9         Q.   Why did you try again?

10        A.   Because I had more contacts.  I don't remember.  11:52:38

11   But one possible reason is I was gave more contacts.

12   Another reason, that I just hope for another customer

13   service.  Yeah, those are two the possible reasons.  And

14   also I remember the third reason, maybe the real reason:

15   Because I also tried to check out of three bureaus,        11:53:10

16   which one I appeal to, which one went through, which one

17   replied or not.  But I just cannot find the history.  So

18   I tried to re appeal again.

19        Q.   And did you receive any to response this

20   submission?                                                11:53:33

21        A.   Maybe, yes.  I lost track what I respond; I

22   received response from this or that or both.  But I

23   think the gist is that this will say they cannot correct

24   this.

25             Maybe I remember another possibility, that I    11:54:49

                                                                50

1    appealed it before I received the previous response.

2    Yeah, I don't know whether they received it or not.

3        Q.    When you were first discussing your reaction to

4    receiving the Chase e-mail one of the things you said

5    was you tried to appeal.  Is this the appeal you were        11:55:23

6    speaking of?

7        A.    Yes, and also the conversation with Better

8    Mortgage and TMS.

9        Q.    Did you do anything else trying to appeal?

10       A.    Yes, that customer financial department.           11:55:47

11       Q.    Did you receive any response from the consumer

12   financial department?

13       A.    Yeah, I think that one I even got a response

14   from Better Mortgage or The Money Source, from one of

15   them, yes.  That department just helped me to get a          11:56:12

16   response.  But that department cannot answer my

17   question.  They just pushed to have an answer for me.

18       Q.    And you said you got another response either

19   from Better or The Money Source?

20       A.    Yes.                                               11:56:27

21       Q.    What do you mean by that?

22       A.    I think I received an e-mail from, like, an

23   answer to my appeal.

24       Q.    And do you recall the substance of that answer?

25       A.    Yeah.  My takeaway is that they do not think      11:56:40

51

1    this is their fault.  They cannot remove the negative at

2    this time.

3        Q.  Was there any explain provided of why they

4    could not remove it?

5        A.  I think we have documents there.  But my memory    11:56:59

6    is they were saying it's just -- they -- just because

7    the late payment.  They do not care why.  They just say,

8    okay, it's really a late payment, and then we report the

9    late payment.

10           Yeah, I agree with that, it's a late payment.    11:57:24

11   But what I appeal is the why part.

12       Q.  Did you ever ask any of the credit reporting

13   agencies to list on your credit report that why part

14   that you were just speaking of?

15       A.  Yes.                                               11:57:44

16       Q.  What credit reporting agency did you make that

17   request to?

18       A.  Sorry.  I may correct myself.  I didn't put the

19   why part in my credit report.  What I requested was to

20   remove that negative activity.  I didn't ask them to put    11:58:09

21   the way part in.

22       Q.  Did you ever ask anyone at Better Mortgage or

23   The Money Source to put in the why part?

24       A.  I don't remember.  Maybe in the conversation I

25   asked them to explain to the credit bureau the reason of    11:58:34

52

1    the late payment.  But I do not remember right now or

2    how I communicated that.  But, yeah, during the

3    conversation I should mention that; the most important

4    is the why right part.

5        Q.   You discussed earlier that at the time you        11:59:01

6    received this Chase e-mail you were doing another

7    refinance with Bank of America.

8        A.   Right.

9        Q.   What refinance are you speaking of?

10       A.   That was a refinance after the refinance with     11:59:20

11   Better.  That is from the 2.75 to 2.825.

12       Q.   And were you just seeking that refinance to get

13   a lower interest rate at that time?

14       A.   Yes.

15       Q.   And were you able to refinance the loan with      11:59:58

16   Bank of America at that time?

17       A.   No.

18       Q.   Why not?

19       A.   Because the credit was damaged.

20            (Defendants' Exhibit 120 marked.)

21   BY MS. SCHRATZ:

22       Q.   I'll hand you what we'll mark as Exhibit 120;

23   do you recognize this document?

24       A.   Yes.

25       Q.   And what is this document?                        12:00:43

                                                                        53

1        A.   This is the loan estimate provided by Bank of

2    America for my refinance.

3        Q.   And ultimately you did not close on this loan;

4    is that right?

5        A.   That's right.                              12:01:14

6        Q.   At the bottom of the first page, near the

7    bottom it says, Estimated closing costs $17,706.  Did

8    you understand that those were charges that were going

9    to be required as part of this refinance loan?

10       A.   Yes.                                        12:01:29

11            (Defendants' Exhibit 121 marked.)

12   BY MS. SCHRATZ:

13       Q.   I'm going hand you what we'll mark as

14   Exhibit 121.  Do you recognize this document?

15       A.   Hmm-mmm.                                    12:02:55

16       Q.   Is that a yes?

17       A.   Yes.

18       Q.   And what is this?

19       A.   Basically the loan officer from the Bank of

20   America told me that the loan, the refinance cannot     12:03:05

21   finish and we stop.

22       Q.   So this appears to be an e-mail sent to you; do

23   you recall receiving this e-mail?

24       A.   Yes.

25       Q.   And do you believe you received it on          12:03:26

1    April 11, 2022?

2        A.   Yes.

3        Q.   This discusses in part, We will need to cancel

4    loan due to inactivity.

5        A.   Hmm-mmm.                                    12:03:37

6        Q.   Do you have any understanding what is meant by

7    "inactivity"?

8        A.   They need me to fix my credit first because the

9    estimate was based on my previous credit report.  So in

10   conversation I already shared this issue with the loan     12:04:05

11   officer.  And I was hoping I can solve the issue,

12   correct my credit score, like, in a timely manner and

13   then we can resume the activity with Bank of America.

14   But I think it was like two or three months, but it's

15   still not finished.  And at that time they can only hold  12:04:31

16   this loan for me for a time.  They can no longer hold it

17   for me.  They cannot wait for me to solve this issue

18   anymore.

19       Q.   Do you have any understanding of what your

20   credit score was at that time?                       12:04:46

21       A.   Yes.  I think it was 600 something.

22       Q.   Have you provided any documentation in this

23   case showing the credit score at that time?

24       A.   Provided to who?

25       Q.   Have you disclosed it in this litigation?    12:05:05

55

1       A.   Disclosed?

2       Q.   Have you provided a copy to your attorney or

3   anyone else?

4       A.   I don't think so.

5       Q.   Do you have documentation that shows your        12:05:15

6   credit score at that time that's available to you?

7       A.   Not right now.  But I think we can track the

8   history of my credit from the bank, some online service

9   or the bureaus or Chase.  If I remember correctly, they

10  showed me the credit history, not only the current.     12:05:40

11      MS. SCHRATZ:  That's one of the documents that

12  we requested for this depo today.  So if possible, we'd

13  like that to be produced.

14      MR. MILDE:  That's fine.  I don't think he's

15  done that or provided that or gone online and seen it    12:05:55

16  himself.  But we can see if we can get that done.

17      MS. SCHRATZ:  I appreciate that.

18  BY MS. SCHRATZ:

19      Q.   Did you have any discussions with Bank of

20  America at that time of trying to approve this refinance  12:06:24

21  loan based on different terms based on your credit at

22  that time?

23      A.   Yes.  With different terms, then I need to pay

24  more cash to close because the rate drop is only from

25  2.75 to 2.62.  So they cannot lower anymore.  If higher,  12:06:44

56

1    then it's the same as before.  Then there's no need for

2    refinance.

3        Q.   So they discussed another offer with you.  But

4    you did not want to accept any other such offer; is that

5    correct?                                              12:07:11

6             MR. MILDE:  Objection.  Asked and answered.

7    He's told you why he wasn't able to lower his rate.

8             THE WITNESS:  Right.  The other offer doesn't

9    make sense.

10            (Defendants' Exhibit 122 marked.)           12:07:27

11   BY MS. SCHRATZ:

12       Q.   The next document will be Exhibit 122.  I made

13   it as clear as I could.  Do you recognize this document?

14       A.   Yes.

15       Q.   What is this document?                       12:08:20

16       A.   This is a notification from Bank of America

17   that told me due to the credit issue the refinance

18   cannot be approved.

19       Q.   Did do you anything in response to receiving

20   this letter?                                          12:08:52

21       A.   I just kept for appeal for my credit.  I think

22   what they did makes sense for me.

23       Q.   Did you try to refinance with any other

24   companies at that time?

25       A.   Not for this loan.                           12:09:25

                                                                57

1     Q.   Did you try to refinance any of your other

2  properties at that time?

3     A.   Not refinance.  I tried to purchase another

4  rental property and the mortgage rate was also affected

5  by this credit issue.               12:09:59

6     Q.   Have you since refinanced this home with Better

7  Mortgage?

8     A.   No.  I'm still with Allied.

9     Q.   So Allied Bank is the current servicer for this

10  same loan?                      12:10:27

11     A.   Yes.

12     Q.   If you can look on page 3 of this document,

13  Exhibit 122, provides your credit score of 747.  Do you

14  have any understanding of why that information is

15  included on this document?          12:11:18

16     A.   I think this was -- like, they pulled my credit

17  a long time before -- that's my understanding -- before

18  the activity.  Because when I initiated refinance with

19  Bank of America they need to approve my credit first and

20  to decide how to provide the loan estimate.  I think   12:11:48

21  this one was from a long time ago, maybe.

22     Q.   Right below the score it says

23  November 4, 2021.

24     A.   Yeah, that makes sense because I started the

25  finance with them around that time.        12:12:06

58

1      Q.   So you started the refinance in November?

2      A.   Yes.

3      Q.   Why was it that you were still working on the

4   refinance in January?

5      A.   I need to -- oh, there is my passport or -- oh,   12:12:22

6   it just took time.  I think I first need to finish all

7   the work with Better Mortgage, and then they

8   later -- yeah, later it was like some documentation

9   issue; I need to provide some documentation.  But it

10   expired.  It was my passport or my driver's license,     12:13:07

11   something like that.  I don't remember exactly.  There

12   was something going on there.  So I had to wait until

13   that was cleared.

14      Q.   Something expired and you didn't notice?  You

15   don't have to answer that.  It happens to all of us.     12:13:23

16      A.   Bank of America has a relationship with

17   Merrill, another broker.

18      Q.   Merrill Lynch?

19      A.   Yeah, Merrill Lynch.  I think I need to put

20   some money in there and I need to set an account and     12:14:03

21   basically to do this refinance.  I worked with someone

22   from Merrill Lynch to set up account there and transfer

23   my, like, stock to there.  And that took time.  That's

24   my memory.

25      Q.   Earlier you mentioned around the same time a     12:14:29

1    purchase of another property.  What were you speaking

2    of?

3        A.   That's 2022, around May.  That's the one in

4    Indiana, South Bend.

5        Q.   And were you able to purchase that South Bend    12:14:44

6    property?

7        A.   Yes.

8        Q.   And that's the address we discussed earlier in

9    South Bend?

10       A.   Yeah, 405.                                        12:15:12

11       Q.   Before we get to that did you also attempt to

12   purchase a property in Colorado at that time?

13       A.   Yes.

14       Q.   And why were you attempting to purchase a

15   property in Colorado at that time?                         12:15:39

16       A.   I was actively looking for investment

17   opportunities across the country, yeah, in different

18   states.  Colorado was my first option.  I spent a lot of

19   time there so I try to find a good property.  And I

20   worked with an agent there.  But, yeah, that one I        12:16:05

21   didn't finish.  Eventually I purchased the one in

22   Indiana.

23       Q.   So you purchased the one in Indiana instead

24   of --

25       A.   Yeah, instead of.                                 12:16:26

                                                                       60

```
 1              (Defendants' Exhibit 123 marked.)

 2    BY MS. SCHRATZ:

 3        Q.   I'd like to hand you what we'll mark as

 4    Exhibit 123.  This document says it's a contract to buy

 5    and sale real estate residential with a date of          12:16:46

 6    January 9, 2022.

 7        A.   Hmm-mmm.

 8        Q.   Feel free to take your time to review this.

 9    It's a large document.  Once you're done with that let

10    me know if you recognize this document.                  12:17:00

11        A.   Yeah, I think this is the contract for that

12    home.

13        Q.   So earlier when we were discussing your

14    attempts to purchase a home in Colorado for an

15    investment, is this the contract related to those        12:17:53

16    efforts?

17        A.   Yes.

18        Q.   And this is dated January 9, 2022.  Do you

19    believe those efforts were ongoing at that time?

20        A.   Yes.                                             12:18:04

21        Q.   And why did you not purchase the home in

22    Arvada, Colorado?

23        A.   At that time I already knew there is a credit

24    issue.  So I will have difficulties or higher rate or

25    even not finish the loan.  Yeah, so I tried to resolve   12:18:26
```

1   the credit issue first.

2       Q.   Did you ever apply for financing related to the

3   potential purchase of that Arvada, Colorado home?

4       A.   Yes.

5       Q.   Who did you apply for financing with?        12:18:48

6       A.   I tried shopping around for the mortgage.  I

7   remember I contacted with Chase, maybe also some local

8   loan officers in Arvada.

9       Q.   And do you have any documents related to those

10  efforts to obtain that financing?                      12:19:23

11      A.   Yeah, I believe so.

12           MS. SCHRATZ:  I don't believe any of those

13  documents have been produced from Chase or local loan

14  officers.  So if we can have a search conducted and have

15  those produced.                                        12:19:34

16           MR. MILDE:  Okay, we'll do that.

17  BY MS. SCHRATZ:

18      Q.   Do you recall applying with anyone else for

19  that financing for this Arvada, Colorado purchase?

20      A.   You mean apply for finance?                   12:19:44

21      Q.   Did you apply with anyone else to try to

22  finance there?

23      A.   No.

24      Q.   And do you recall if you received any decisions

25  or any feedback from the application that you submitted  12:20:02

1    with Chase regarding financing for this Colorado

2    property?

3        A.   Yeah, I believe so, similar to the one from

4    that I mentioned.  They cannot approve.

5        Q.   Did you receive any response regarding your      12:20:20

6    efforts with any local officers in Arvada?

7        A.   Yeah, I think at least I have received the

8    answer from the loan officer.  I eventually selected

9    from one of them.  But I believe it's Chase, not the

10   local bank officer.                                       12:20:45

11       Q.   Did they give you any terms that would provide

12   financing for this purchase in Colorado?

13       A.   If I remember correctly, yes.  But they didn't

14   use my latest credit score.  They still -- based on the

15   previous credit they provided it.  If I remember          12:21:13

16   correctly, they provided me -- they provided me a loan

17   estimate similar to Bank of America.  It's kind of a low

18   rate.  But also that loan didn't finish because I know

19   there's a credit issue there I cannot finish it.

20       Q.   When you say you didn't finish it is that        12:21:41

21   because you stopped the process or something else?

22       A.   I shared the credit issue with the loan

23   officer.  Yeah, I think we collectively stopped because

24   it was misinformation in the application.

25       Q.   Did you ask Chase or any of the local loan       12:22:05

                                                                          63

1  officers in Arvada if they would approve financing for

2  this purchase even with that negative credit

3  information?

4      A.   I don't remember.  But to be honest, I don't

5  think I tried that.  My mindset was to try to resolve.    12:22:26

6  I was thinking I can resolve this credit issue shortly

7  and then I can come back to do the finance again.  So I

8  didn't try to use, like, a very low credit score to get

9  the finance.

10     Q.   Regarding this Colorado attempted purchase, did    12:22:52

11 you ever submit any earnest money deposit for that

12 purchase?

13     A.   I don't remember.  Maybe not.  I don't

14 remember.

15     Q.   If you look at Exhibit 123 in the bottom right    12:23:17

16 corner of the page that says XU00025 it mentions earnest

17 money $5,000.

18     A.   Okay.

19     Q.   Do you recall if you ever submitted any earnest

20 money in that amount or any other amount for this    12:23:47

21 purchase?

22     A.   I still not remember whether we were at that

23 stage or not.

24     Q.   Did you cancel this contract for the Arvada,

25 Colorado purchase?    12:24:57

64

1      A.   Yeah, we didn't proceed.

2      Q.   When did you cancel it?

3      A.   I don't remember exactly.  But definitely

4   before we signed the contract.

5      Q.   If you look at the last page of Exhibit 123      12:25:13

6   there appears to be your electronic signature there.

7      A.   Hmm-mmm.

8      Q.   Do you recall electronically signing this

9   document?

10      A.   Yeah, I don't remember when we stopped the      12:25:50

11   effort.  Okay.  Okay.  Yeah, we signed the contract

12   first and then work on the loan.  And then the loan have

13   issues, then we stopped.  Yeah, we have a contingency

14   there about -- yeah, this is my signature.  Yeah, I

15   signed it, yeah.                                         12:26:24

16      Q.   Do you recall when you canceled this contract?

17      A.   It's like maybe around end of January when we

18   figured I cannot solve the credit issue before the

19   deadline for the loan to finish.

20           (Defendants' Exhibit 124 marked.)             12:26:51

21   BY MS. SCHRATZ:

22      Q.   I'm handing you what we'll mark as Exhibit 124.

23   This appears to be an e-mail from Notre Dame Federal

24   Credit Union from May 14, 2022.

25      A.   Hmm-mmm.                                         12:27:25

                                                                65

1        Q.   Do you recognize this document?

2        A.   Yes.

3        Q.   What is this document?

4        A.   Alex is the loan officer for my South Bend

5   home.  I was asking him what if my credit score was not    12:27:40

6   damaged, what's the rate it would be.  And this is his

7   answer.

8        Q.   So this is related to your purchase of the

9   South Bend, Indiana property?

10       A.   Right, right.                                     12:27:58

11       Q.   When did you begin the process of purchasing

12   the South Bend, Indiana property?

13       A.   I think around May 2022.

14       Q.   And you were ultimately able to complete that

15   purchase?                                                  12:28:16

16       A.   Right.

17       Q.   Did you obtain financing for that purchase from

18   Notre Dame Federal Credit Union?

19       A.   Yes.

20       Q.   What rate were you able to obtain for that       12:28:24

21   loan?

22       A.   It's a higher rate.  If I remember correctly,

23   it's 5.25 or 5.125, something like that.

24       Q.   Other than what we've discussed, have you

25   attempted to purchase any other property since 2021?      12:29:04

                                                                    66

1    A.    Yes.  I purchased another one in Michigan.

2    Q.    Is that Lawton, Michigan property?

3    A.    Yeah.

4    Q.    When did you purchase that property?

5    A.    November 2023.                                12:29:28

6    Q.    And were you able to obtain financing for that

7    purchase?

8    A.    Yes.

9    Q.    Other than as we've discussed, have you ever

10   been denied credit based upon the delinquency related to  12:30:19

11   the Better Mortgage, Money Source loan?

12   A.    No.

13   Q.    Have you suffered any other adverse credit

14   decisions related to that credit reporting other than

15   what we've discussed?                                12:30:39

16   A.    I don't think so.

17   Q.    Have you suffered any other damages related to

18   this credit report that we've been discussing?

19        MR. MILDE:  I'll just state for the record that

20   damages are alleged in the complaint.                12:31:13

21        THE WITNESS:  Yeah, I think I spent a lot of

22   time on this.  And also this kind of affect my financial

23   planning.  I was at the beginning of my investment

24   journey.  Due to this everything was delayed and also

25   kind of make me -- I cannot -- could not think of the  12:32:01

67

1   financial planning related to credit score like purchase

2   credit cards because I know there was a credit issue, so

3   I just stopped doing it, yeah.

4   BY MS. SCHRATZ:

5       Q.   Do you believe that you've suffered                12:32:40

6   embarrassment or emotional damage related to this

7   negative credit reporting?

8       A.   Yes.

9       Q.   And how have you suffered those damages?

10      A.   I put a lot of thought into this.  And also        12:32:53

11  when I put thought on things I cannot sleep well.  And

12  also we have a group of people to discuss investments

13  together, and I was one of the initial there.  But due

14  to this issue I could not move forward with them

15  together, and, yeah.                                        12:33:25

16      Q.   Have you ever had any other negative credit

17  marks on your credit report other than this one?

18      A.   No.

19      Q.   I think I may have some follow-up questions

20  later.                                                      12:34:01

21          MS. SCHRATZ:  How about we go off the record.

22          MR. MILDE:  Sure.

23          THE VIDEOGRAPHER:  The time is 12:33 p.m.

24  Pacific.  We're off the record.

25          (Lunch recess.)                                     12:34:13

                                                                         68

```
 1              THE VIDEOGRAPHER:   The time is 1:36 Pacific.

 2     We are on the record.

 3              (Defendants' Exhibit 125 marked.)

 4              MS. SCHRATZ:   So we want to just mark real

 5     quickly -- earlier we had discussed that you had          01:37:07

 6     provided me some documents.   So we're going to mark

 7     those documents that you handed me today as Exhibit 125.

 8     It appears to be a letter from Northpointe Bank dated

 9     December 12, 2024.   I may have some follow-up on this

10     later.

11              Berj, I'll turn it over to you.

12                   EXAMINATION BY MR. PARSEGHIAN

13        Q.   Good afternoon, Mr. Xu.

14        A.   Good afternoon.

15        Q.   I'm probably going to jump around a bit.   But    01:37:34

16     I'll try to let you know where I'm going or if I'm

17     changing topics.   I don't want to duplicate what

18     Ms. Schratz has already done.

19        A.   Sounds good.

20        Q.   So have you ever been a party to a civil          01:37:51

21     lawsuit before?

22        A.   No.

23        Q.   Have you ever been a party in a criminal

24     proceeding before?

25        A.   No.                                                01:38:05
```

1        Q.   Have you ever testified in court before?

2        A.   Nope.

3        Q.   Have you been employed by anyone other than

4   Google?

5        A.   I had an internship in other companies.        01:38:29

6        Q.   What other companies did you have internships

7   for?

8        A.   I was in Facebook in 2014.

9        Q.   Any other employment besides Facebook and

10  Google?                                                  01:38:49

11       A.   Yeah, only one.

12       Q.   Where?

13       A.   No, nothing else.

14       Q.   Just Facebook and Google?

15       A.   Yes, that's true.                              01:40:02

16       Q.   So we talked about the three rental properties

17  that you own and the 3637 Ramona home that you own.

18  Have you owned any other real estate besides those four

19  properties?

20       A.   Nope.  Before that I rent home.  I didn't own  01:40:24

21  any.

22       Q.   Where did you rent before that?

23       A.   I rent in Mountain View, 58 Evandale Avenue.

24  And before that I was in Texas.

25       Q.   And was 58 Evandale Avenue in Mountain View a  01:40:50

                                                                    70

1   single family home or an apartment?

2        A.   It's a four-plex.  I rent one of the four.

3        Q.   Your current servicer on the 3637 Ramona, Palo

4   Alto home is Allied Bank?

5        A.   Yeah.                                          01:41:28

6        Q.   And who is the current servicer for 99 East

7   Middlefield Road in Mountain View?

8        A.   It was First Republic Bank.  But it was

9   purchased by Chase.  So I believe currently it's Chase.

10       Q.   And what about 405 Wakwa Avenue in South Bend?  01:41:55

11       A.   Northpointe Federal Credit Union.

12       Q.   And what about 83280 Waldron Drive in Lawton,

13   Michigan?

14       A.   Northpointe.

15       Q.   And I believe you said that you just did a      01:42:17

16   refinance for one of your properties; which property was

17   that?

18       A.   That the last one in Michigan.

19       Q.   So you purchased the property in Michigan in

20   2023?                                                    01:42:38

21       A.   Right.

22       Q.   And you refinanced it since then?

23       A.   Right.  I just finished the refinance like one

24   month ago.

25       Q.   And what was the rate on that refinance?        01:42:47

71

1          A.    It was from 7.2526 or 7.1226, something like

2     that.

3          Q.    Have you ever been late on a mortgage payment

4     besides the payment that's the subject of this case?

5          A.    No.                                          01:43:20

6          Q.    Have you ever been late on any payment besides

7     the payment that's the subject of this case?

8          A.    No.

9          Q.    If you can take a look at Exhibit 118.

10         A.    Yes.                                         01:44:06

11         Q.    And this is the first dispute that you

12    submitted to TransUnion; is that right?

13         A.    I disputed to three bureaus around similar

14    time.  I don't remember which one went first.  But it's

15    in the first batch.                                    01:44:28

16         Q.    And this was to TransUnion, this particular

17    one?

18         A.    Yeah.

19         Q.    In the middle of the page it says, Primary

20    address 99 Middlefield Mountain View, California.  Why   01:44:39

21    did you use the Middlefield address as your primary

22    address on this complaint?

23         A.    I do not remember.  I don't think -- maybe it

24    was just a mistake.  Maybe I did the auto filling, my

25    browser auto fill it and I didn't correct it.  But at    01:45:09

1    that point I didn't live in Mountain View.  I lived in

2    Palo Alto home.

3        Q.   If you take a look at Exhibit 119.  And that's

4    the second dispute that you submitted to TransUnion;

5    right?  That's right?                           01:45:34

6        A.   Right.

7        Q.   And on this one you have listed 99 East

8    Middlefield Road as your primary address and 3637 Ramona

9    Street as your secondary address; correct?

10       A.   Right.                                 01:45:53

11       Q.   Why did you do that?

12       A.   I don't think I intentionally do that.  It was

13   maybe just a mistake.  2022.  I purchased the home in

14   Palo Alto in 2021.  And we rent back to the previous

15   owner for three months.  We moved into the Palo Alto   01:46:27

16   home in August 2021.  So at this point the submission

17   date 2022 matched.  Yeah, I lived in Palo Alto.

18       Q.   Okay.  So I'm done with those.

19           MR. PARSEGHIAN:  Let's do this.  If you can

20   please mark as Exhibit 126, it's a document Bates   01:47:44

21   numbered BMC000017 to 18 entitled "Consent to Receive

22   Electronic Loan Documents."

23           (Defendants' Exhibit 126 marked.)

24   BY MR. PARSEGHIAN:

25       Q.   And please let me know when you've had an   01:48:32

73

```
 1    opportunity to review Exhibit 126.

 2        A.   Yeah, I'm looking at it.

 3            MR. MILDE:  Would it be possible to print this

 4    so we can all see it more clearly?  Anybody?

 5            MS. SCHRATZ:  I don't think so.  There's a copy  01:49:04

 6    machine, but that would be -- Berj, do you mind if we go

 7    off the record to see if we can print your exhibits

 8    because they're having a hard time reviewing them.

 9            MR. PARSEGHIAN:  Sure.  Let's go off the record

10    for a minute.                                            01:49:43

11            THE VIDEOGRAPHER:  The time is 1:49 p.m. and

12    we're off the record.

13            (Recess.)

14            THE VIDEOGRAPHER:  The time is 2:32 Pacific.

15    We're are on the record.                                02:32:33

16    BY MR. PARSEGHIAN:

17        Q.   Thanks for your patience, Mr. Xu.  I'm going --

18            MR. MILDE:  Berj, your camera is off.  There

19    you go.

20    BY MR. PARSEGHIAN:                                       02:32:50

21        Q.   So let me ask you to take look at Exhibit 107

22    again.  Exhibit 107 is the e-mail from Better that

23    prompted you to set up the account at The Money Source;

24    correct?

25        A.   Right.                                          02:33:23
```

74

1      Q.   And then in response to that you set up the

2   account.  And that's -- the confirmation e-mail for that

3   was Exhibit 109?

4      A.   Hmm-mmm, yes.

5      Q.   Then on that same day you also enrolled in        02:33:40

6   paperless communication and you made your first manual

7   payment, one-time payment?

8      A.   Right.

9      Q.   Okay.  And that same day you set auto pay?

10     A.   Yeah, I believe so.                              02:34:01

11     Q.   And when you set up the payment the -- strike

12  that.

13          When you set up the one-time payment that was

14  the direct transfer from a bank account?

15     A.   Right, from my bank, Chase checking account.     02:34:23

16     Q.   So that was from your Chase checking account

17  that the one-time payment for $8,153.74?

18     A.   Right.

19     Q.   And then for the auto pay, did you set that up

20  with the same bank account?                              02:34:46

21     A.   Yes.  I just provided one account number,

22  nothing else.

23     Q.   And did you enter your bank account

24  information, then, twice on November 3rd, once for the

25  auto pay and once for the one-time payment?             02:35:05

1     A.   No, I do not remember.  Yeah, I don't remember

2     whether I input twice or once.

3     Q.   How did you do the one-time payment?  What was

4     the process for that?

5     A.   To be honest, I don't remember.  Most likely I   02:35:26

6     input the account number, route number and then set up

7     the auto payment.  And I want to make sure I make the

8     first payment.  And also I want to make sure it goes

9     through once.  Then I may click one button to make a

10    payment right now for the due amount.  That's my guess.   02:35:57

11    That's what I do for another mortgage.  I guess I was

12    doing the same thing for this.

13    Q.   So you made a one-time payment and then you

14    also separately set up auto pay?

15    A.   Yeah.                                               02:36:18

16         MR. MILDE:  Objection.  I think that misstates

17    his testimony.  I don't think he was clear on exactly

18    what happened.

19         But you can answer the question.

20         THE WITNESS:  Yeah, I don't remember exactly,     02:36:25

21    like, how many times I input the account number or route

22    number.  But I put numbers there and set up the auto

23    payment and click on the button to make one-time

24    payment.

25    ////                                                   02:36:44

```
 1    BY MR. PARSEGHIAN:

 2         Q.   But in any event, you did three things:  You

 3    set up paperless communication; you made a one-time

 4    payment, and you set up auto payment all on November

 5    3rd; that's your testimony?                        02:37:02

 6         A.   Yeah.

 7         Q.   And November 3rd was the only day that you

 8    dealt with this payment stuff?

 9              MR. MILDE:  Objection.  Vague and ambiguous.

10    BY MR. PARSEGHIAN:                                 02:37:22

11         Q.   I'll ask a better question.

12              November 3rd was the only day that you set up

13    or made any payments yourself on this account?

14         A.   Right.

15         Q.   Would you take a look at Exhibit 114 again,  02:37:37

16    please.

17         A.   Yes.

18         Q.   And this is the November 5th notice of mortgage

19    servicing transfer --

20         A.   Hmm-mmm.                                  02:38:08

21         Q.   -- to Allied Bank.

22         A.   Hmm-mmm.

23         Q.   And you've never seen this document before

24    today; is that your testimony?

25         A.   Yeah, I never seen this.                  02:38:18
```

77

1         Q.   Today sitting here in this deposition is the

2    first time you've seen this?

3         A.   Yes.

4         Q.   When you got the alert from Chase Bank and

5    tried to make the payment on the account did you do that    02:38:54

6    the same day that you got the alert from Chase Bank?

7         A.   As I mentioned earlier today, I don't remember

8    exactly.  That means I tried to make the payment on the

9    same day.  But I vaguely remember I could not do that on

10   the TMS online account.  Even now I cannot remember who     02:39:23

11   I eventually paid for that overdue amount, whether TMS

12   or Allied.  I don't remember exactly.  But at the same

13   day I tried to make the payment.

14        Q.   And eventually you did make the payment?

15        A.   Sorry.  Can you repeat?                           02:39:57

16        Q.   So eventually you did make the payment?

17        A.   Yeah, eventually.

18        Q.   And it was about double, twice the normal

19   monthly payment?

20        A.   Right.  The amount due, yeah.                     02:40:11

21        Q.   And was that from your Chase checking account

22   as well?

23        A.   Yes, I believe so.

24        Q.   Do you have any other checking accounts that

25   you use or is it the Chase account primarily?              02:40:24

                                                                        78

1       A.   I have other accounts.  But the primary one is

2   the Chase one.

3       Q.   So if we got bank statements from your Chase

4   account we would know when that payment was made?

5       A.   Right.                                    02:40:39

6       Q.   Would you please take a look at Exhibit 122.

7       A.   Yes.

8       Q.   Was this the last communication you had with

9   Bank of America about this refinance?

10      A.   Yeah.                                     02:41:23

11      Q.   And how did you get this denial from Bank of

12  America?  Was that in the mail?

13      A.   Yes.  This is mail, yeah.

14      Q.   Could you take a look at Exhibit 123.

15      A.   Hmm-mmm, yes.                             02:41:57

16      Q.   When you canceled the contract for the Colorado

17  property there were no penalties or anything like that

18  that you had to pay; correct?

19      A.   Correct.

20      Q.   You didn't have to pay the seller of the     02:42:23

21  property any money for that Colorado property; correct?

22      A.   Correct.  I had a contingency.  So that's why I

23  could stop the transaction.

24      Q.   You were able to stop the transaction without

25  having to pay anything?                            02:42:46

1        A.   To the seller.  But I still I think I paid some

2   fee to the loaner, like the appraisal fee, something

3   like that.

4        Q.   So how much fees did you pay to the lender?

5        A.   I don't remember exactly.  But it should be      02:43:03

6   several hundred, something like that.

7        Q.   Less than a thousand dollars?

8        A.   Yeah.

9        Q.   In your amended initial disclosures it says

10  that, Mr. Xu lost approximately $268,000 because of this  02:43:23

11  inability to complete the purchase of the property in

12  Arvada, Colorado.  Do you know how that $268,000 was

13  calculated?

14       A.   Yeah.  Roughly, it was several parts.  One part

15  is that value of the property went high after I closed    02:43:44

16  the transaction.  The second is that I lost income from

17  that property if I purchased it and rented at a

18  short-term rental.  Yeah, I think that's it.

19       Q.   And how much of that $268,000 was for the value

20  of the property having increased?                         02:44:26

21       A.   To be honest, I don't know.  I haven't checked

22  that for that value.  I don't know what's the market

23  value for that property right now.  But at some point, I

24  think based on Redfin estimate it's around

25  575 -- 750,000, something.  But those are estimations.    02:44:52

1    I do not know the exact value.  You have to sell it to

2    know the exact value.

3         Q.   And how much of the $268,000 was due to lost

4    income?

5         A.   I did some calculations.  But I cannot remember  02:45:16

6    off the top my head right now.  If you want to know the

7    breakdown I can share the breakdown with you.

8         Q.   Yeah, we'd like to know the breakdown for that.

9    There's a document you put together that shows the

10   breakdown?                                                  02:45:26

11        A.   Yeah.  When I calculated that number I break it

12   down.  Each item I have an estimate and I summed them

13   up.

14        Q.   And there's a document that shows that;

15   correct?                                                    02:45:54

16        A.   Yes.

17        MR. MILDE:  I'm going to object that could

18   easily be attorney-client privileged communication.  So

19   I'm not necessarily agreeing to produce that.  I don't

20   necessarily no if I've seen that.  But we can talk about  02:46:12

21   that later.  But right now we're keeping that privileged

22   objection out there.

23        MR. PARSEGHIAN:  Okay.  I assume if you're

24   going to claim privilege you're going provide a

25   privilege log.                                              02:46:32

81

```
 1    BY MR. PARSEGHIAN:

 2         Q.   Okay.  You also said that, when you were

 3    talking about some of the issues that you have a group

 4    of people that you discuss finances with; what is that?

 5         A.   It's just a group inside Google.  We have,      02:46:49

 6    like, financial planning group investment group.  We

 7    discuss, like, investment opportunities there.  We learn

 8    from each other, like how to do short-term rentals,

 9    where to buy homes.

10         Q.   And who is in that group?                       02:47:17

11         A.   Google colleagues.

12         Q.   Who are the specific people that are in that

13    group?

14         A.   We have lots of people there.

15         Q.   How many people?                                02:47:32

16         A.   I don't know how many people.  It's like a

17    website.  It's like Reddit, inside Google.

18         Q.   Okay.  So it's not a group that meets in

19    person; it's a web group?

20         A.   Oh, we also have, like, a weekly meet-up.  But  02:47:51

21    it's just optional.  Sometimes some people show up,

22    others do not.

23         Q.   Do you show up?

24         A.   Yeah.  I was one of the initial group, yeah.

25         Q.   And are you still in that group?                02:48:13
```

                                                                    82

1      A.    Yes.  But it's less active than before.

2      Q.    The group is less active or you're less active?

3      A.    Both.  I think the initial people, including

4  me, are less active so the group is less active.

5      Q.    You said that you had difficulty sleeping        02:48:42

6  because of these issues?

7      A.    Yeah.

8      Q.    For what period of time did you have difficulty

9  sleeping?

10      A.    I think maybe from the beginning of 2022 to       02:49:08

11  around the end of 2022, yeah.

12      Q.    And how often did you have difficulty sleeping?

13      A.    I think just in general.  Like, it's kind

14  of -- I relate it to that period.

15      Q.    So before 2022 did you ever have difficulty      02:49:55

16  sleeping because of something going on at work?

17      A.    No.

18      Q.    You never had difficulty sleeping before 2022?

19      A.    Maybe occasionally.  Like, when we faced some

20  urgent deadline and I spend a long day at work, yeah,     02:50:22

21  then maybe occasionally.

22      Q.    Did you see a doctor for anything in 2022?

23          MR. MILDE:  Objection.  That's fringing on the

24  right to privacy in his medical personal life.  You can

25  ask him about related to the incidents that are the       02:50:51

83

```
 1    subject of this lawsuit.  We're not going to get into

 2    his whole medical history.

 3              MR. PARSEGHIAN:  I think I can get a little

 4    broader than that.  But I can ask another question.

 5    BY MR. PARSEGHIAN:                              02:51:01

 6        Q.   Did you see a doctor for difficulty sleeping in

 7    2022?

 8        A.   No.

 9        Q.   Have you had any care from a doctor for any

10    mental or emotional issues during 2022?         02:51:28

11        A.   Yes, I think I discussed this with my family

12    doctor.  But I don't think I reached a point where I

13    needed medical involvement.  It was just a discussion.

14    I think I tried to do some exercise, put these things

15    down.  Yeah, also I think I reached out and look at    02:51:56

16    professional input.

17        Q.   What was this professional input in relation

18    to?  What condition?

19              MR. MILDE:  Hold on.  Can we go off the record

20    again?  I don't think it's appropriate to get into every 02:52:19

21    aspect of Mr. Xu's medical or psychological issues.  I

22    think we've got to confine ourselves related to this

23    lawsuit.  So I'm going to object.  I'm going to instruct

24    the witness not to answer unless you want to give us

25    time to take a break and give us time to talk about it  02:52:41
```

84

```
 1    and see if he's open to talk about it.  Right now I'm

 2    not ready to go there.

 3              MR. PARSEGHIAN:  So you're instructing him not

 4    to answer?

 5    BY MR. PARSEGHIAN:

 6       Q.   And are you following your attorney's

 7    instruction to not answer the question?

 8       A.   Yes.

 9       Q.   What is the name of your family doctor?

10       A.   Dr. Can Jiang.                               02:53:04

11       Q.   Could you spell that, please.

12       A.   Yeah.  First name is C-a-n.  Last name is

13    J-i-a-n-g.

14       Q.   And where is his office located?

15       A.   In Stanford Hospital, Palo Alto.             02:53:24

16       Q.   And what is his medical specialty?

17       A.   She's our family doctor, medical doctor.

18       Q.   So I'm going to change topics here.

19              After you got the credit alert from Chase when

20    is the first time you contacted someone at Better      02:55:04

21    Mortgage?  Focusing specifically now on Better Mortgage.

22       A.   First of all, I can't remember exact date.  But

23    I know I almost immediately tried to reach out to Better

24    Mortgage.  And TMS sent immediately or like within a

25    couple of days -- yeah, I mentioned earlier today I kind  02:55:37
```

85

1    of see the Better Mortgage and the TMS as a single unit,

2    from my point of view, so I didn't try to distinguish

3    one with the other.  But I do remember from my point of

4    view Better Mortgage is more involved with my mortgage

5    because initially I worked with Better Mortgage to do        02:56:11

6    this refinance so I see Better Mortgage is the interface

7    between me and the refinance.  So if I remember

8    correctly, I first reached out to Better Mortgage and

9    Money Source.

10        Q.   Who at Better Mortgage did you reach out to       02:56:32

11   after you got the credit alert from Chase?

12             MR. MILDE:  I'm going to object.  This has

13   already been covered extensively by Ms. Schratz.  I'll

14   let you go a little bit into this.  But I don't want you

15   to rehash the whole testimony that's gone on for the        02:56:52

16   last couple hours.

17             Go ahead and answer.

18             THE WITNESS:  Yeah, I think I answered that

19   earlier today.  I reached out to the loan officer from

20   the Better Mortgage through e-mail, asked her if she can    02:57:07

21   help with this situation.  And she answered I need

22   to -- she cannot help and I need to talk with someone

23   else at Better Mortgage.

24   BY MR. PARSEGHIAN:

25        Q.   So who was that loan officer that you reached     02:57:23

86

1    out to?

2         A.   I can't remember the exact name.  But I can

3    figure out in my inbox and my e-mails.

4         Q.   So you have e-mails with her?

5         A.   Yes, I believe so.                          02:57:38

6         MR. PARSEGHIAN:  Counsel, those have not been

7    produced and they were clearly responsive to our prior

8    discovery.  Are you going to produce those?

9         MR. MILDE:  Yes.

10        MR. PARSEGHIAN:  And why were weren't they       02:57:53

11   produced in advance of the deposition?

12        MR. MILDE:  You're asking me?

13   BY MR. PARSEGHIAN:

14        Q.   I'll ask the question.  That's fine.

15        Why didn't you provide this in advance of the    02:58:04

16   deposition?

17        A.   I didn't know someone asked this.  Did someone

18   ask this before?  Yeah, for me it was a conversation

19   that had no conclusion at all.  It's not that related

20   because what she had answered is just she could not help 02:58:26

21   me, that I need to find out someone else.  After I

22   called Better Mortgage and TMS over and forward to their

23   customer service, that's when I got some concrete

24   answers.

25        Q.   So are there other e-mails that you haven't   02:58:43

                                                              87

1    provided because you thought they weren't important?

2              MR. MILDE:  Objection.  It's overbroad, it's

3    vague and ambiguous.  Presumably you're referring to --

4              MR. PARSEGHIAN:  No speaking objections.  You

5    made your objection.  The witness can answer the        02:59:03

6    question.

7              MR. MILDE:  Go for it.

8              THE WITNESS:  Yeah, I get hundreds of e-mails a

9    day.  From my perspective they are not relevant.  But

10   maybe you think they are relevant.  I don't know when   02:59:16

11   you asked if I have other e-mails that I haven't

12   provided.

13   BY MR. PARSEGHIAN:

14      Q.   You have hundreds of e-mails regarding your

15   mortgage loan?                                          02:59:29

16             MR. MILDE:  Objection.  That misstates his

17   testimony.

18   BY MR. PARSEGHIAN:

19      Q.   Are there other e-mails regarding your mortgage

20   loan through Better Mortgage that you haven't provided  02:59:38

21   because you thought they were not relevant?

22      A.   Yes.  I spoke with Better Mortgage for another

23   refinance for my new home.  I was shopping around when I

24   did the refinance for the lake home.  I also asked

25   Better Mortgage whether they have a better rate.  And   03:00:04

                                                                    88

 1   also I got online, the Allied portal to get the rate for

 2   my investment property purchase.  To be honest, I don't

 3   know.  That's my interaction with Allied.  That doesn't

 4   have anything to do with Better Mortgage.

 5       Q.   What is the "lake home"?                      03:00:49

 6       A.   The lake home is the Michigan home.

 7       Q.   The Michigan home is a lake home?

 8       A.   Yeah.

 9       Q.   So you contacted Better Mortgage for

10   refinancing of the Michigan -- for refinancing of the   03:01:06

11   Michigan home or for initial financing of the Michigan

12   home?

13       A.   I don't remember which one.  Maybe both, maybe

14   either of them.  But I definitely called, tried to get

15   calls from them.  From Allied -- sorry.  Is Allied the   03:01:22

16   same thing as Better Mortgage when I do the call?

17       Q.   I'm asking for Better Mortgage, Allied.

18       A.   Okay.  Somehow -- yeah, I cannot distinguish

19   one with the other one because I somehow feel they share

20   the same portal, online portal.  I just got called from  03:01:51

21   the portal online.  I don't remember if it's from Better

22   Mortgage or Allied.

23       Q.   So you can't distinguish Better Mortgage from

24   Allied Bank either?

25       A.   I cannot remember which one I contacted.  Maybe  03:02:09

                                                              89

1    both.  Yeah, I do not remember.

2        Q.  The loan officer that you were talking about,

3    is that Tori Harris?

4        A.  I don't remember.  Maybe.

5        Q.  So when you were looking to do these other        03:02:29

6    refinancings did you contact the same person at Better

7    Mortgage again?

8        A.  No.  As I mentioned, I tried do to that online

9    by myself and someone noticed my activity and called me,

10   messaged me.  I believe it's a different person.          03:03:04

11       Q.  Okay.  And besides the Michigan home what other

12   home did you contact Better Mortgage about after the

13   property, that's the Ramona property that's at issue

14   here?

15       A.  I can't remember exactly.  But I also contacted   03:03:28

16   them when I tried to purchase the Indiana home.

17   Basically every time when I tried to close a loan I shop

18   around.  And the Better Mortgage, Allied, because they

19   are available online I can call any time by myself.

20       MR. PARSEGHIAN:  So I think this would be a            03:04:46

21   good time to break to see where we're at on the

22   exhibits.

23       MS. SCHRATZ:  Sounds good to me.

24       THE VIDEOGRAPHER:  The time is 3:04 p.m.

25   Pacific.  We are off the record.                          03:04:58

1          (Recess.)

2          THE VIDEOGRAPHER:  The time is 3:19 p.m.

3     Pacific.  We are on the record.

4     BY MR. PARSEGHIAN:

5          Q.  So we've marked as Exhibit 126 a document Bates    03:19:41

6     numbered BMC000017 to 18.  And, Mr. Xu, would you please

7     let me know when you've had an opportunity to review.

8          A.  Yes, I'm looking at it.

9          MR. MILDE:  This is 127.  We had -- I'm sorry.

10    It's on the screen.  Never mind.                           03:20:06

11         THE WITNESS:  Hmm-mmm.

12    BY MR. PARSEGHIAN:

13         Q.  Have you had an opportunity to review

14    Exhibit 126?

15         A.  Yes.                                              03:21:14

16         Q.  And as part of your loan application for this

17    3637 Ramona Circle property you submitted and received

18    documents electronically with Better Mortgage; correct?

19         A.  Hmm-mmm.

20         Q.  And this is a consent to receive electronic      03:21:33

21    loan documents that you electronically signed; correct?

22         A.  Yes.

23         Q.  And on the second page, that's your electronic

24    signature that you put on here?

25         A.  Hmm-mmm.                                          03:21:53

                                                                91

```
 1              (Defendants' Exhibit 127 marked.)

 2    BY MR. PARSEGHIAN:

 3       Q.   If you take a look at Exhibit 127.

 4       A.   Hmm-mmm.

 5       Q.   That's the same consent to receive electronic   03:21:58

 6    loan documents and that was signed by your wife;

 7    correct?

 8       A.   Correct.

 9              (Defendants' Exhibit 128 marked.)

10    BY MR. PARSEGHIAN:

11       Q.   If you would take a look at Exhibit 128.

12       A.   Hmm-mmm.

13       Q.   This is an e-mail that The Money Source sent to

14    you at your robertxjys@gmail.com e-mail address on

15    December 4, 2021?                                        03:22:44

16       A.   Hmm-mmm.

17       Q.   And did you receive this e-mail?

18       A.   I do not remember.  But it seems like it's to

19    my e-mail, yes.

20       Q.   Did you get tax documents from The Money Source  03:22:57

21    for the 2021 tax year?

22       A.   I don't remember.

23       Q.   Did you deduct mortgage interest on your 2021

24    taxes?

25       A.   I should have done that.                         03:23:24
```

                                                                      92

1          Q.   And you would have gotten some tax forms to be

2     able to do that?

3          A.   Yeah, I believe so.

4          Q.   And how did you get that tax information?

5          A.   I do not remember.  I --                          03:23:37

6               MR. MILDE:  You answered the question.

7               THE WITNESS:  To be honest, I don't remember

8     how I got the document for my 2021 tax.  I think 2021

9     tax, yeah, I do not remember.

10    BY MR. PARSEGHIAN:                                          03:24:28

11         Q.   Did you get it electronically or by mail?

12         A.   I do not remember.

13         Q.   You don't remember whether you had to log onto

14    the portal to get your tax documents?

15         A.   To be honest, now I'm not even sure I do the     03:24:48

16    tax deductible for 2021 or not.  I honestly do not

17    remember.

18              (Defendants' Exhibit 129 marked.)

19    BY MR. PARSEGHIAN:

20         Q.   Okay.  Would you please take a look at            03:25:06

21    Exhibit 129.

22         A.   Hmm-mmm.

23         Q.   Let me know when you've had an opportunity to

24    review Exhibit 129.

25         A.   Hmm-mmm.                                          03:25:37

                                                                        93

1        Q.    This is an e-mail that you received from Better

2    Mortgage after your loan had closed?

3        A.    Hmm-mmm.

4        Q.    On October 13, 2021?

5        A.    Hmm-mmm.                                      03:25:58

6        Q.    And it says that, We're reaching out to let you

7    know that your confirmation closing disclosure has been

8    uploaded to your account.

9        A.    Hmm-mmm.

10       Q.    Did you log into your account to get that      03:26:12

11   confirmation closing disclosure?

12       A.    I do not remember.

13            (Defendants' Exhibit 130 marked.)

14   BY MR. PARSEGHIAN:

15       Q.    Would you take a look at Exhibit 130.          03:26:25

16       A.    Hmm-mmm, yes, this is the closing disclosure.

17   I saw this before.

18       Q.    You have seen that before?

19       A.    Hmm-mmm.

20       Q.    So you did receive that post-confirmation      03:26:51

21   closing disclosure that's been marked as Exhibit 130?

22       A.    Yeah, I saw this before.  But I do not remember

23   from which source because -- yeah, I may sign the

24   documents with the notary.  I think at that point I

25   definitely saw the closing statement disclosure.  If I   03:27:22

1    remember correctly, all the closing disclosures is

2    available on the better.com website.

3            MR. PARSEGHIAN:  Let's mark as Exhibit 131 a

4    document.  It's Bates number XU00066 to 72.

5            (Defendants' Exhibit 131 marked.)

6            THE WITNESS:  Hmm-mmm.

7    BY MR. PARSEGHIAN:

8        Q.  So you received this document in the mail;

9    correct?

10       A.  Yes.                                           03:29:02

11       Q.  And you received this from TransUnion in

12   response to your first dispute?

13       A.  Right.

14       Q.  And did you receive a response from TransUnion

15   to your second dispute?                                03:29:21

16       A.  I don't remember.

17       Q.  Did you receive a response from any of the

18   other credit reporting agencies to the disputes that you

19   had submitted?

20       A.  I don't remember.                              03:29:37

21       Q.  So as you sit here today the only response that

22   you know of is Exhibit 131?

23       A.  Right.

24           MR. PARSEGHIAN:  Okay.  Can we close here to

25   check on the exhibits again?                           03:30:10

```
 1              MR. MILDE:  Sure.

 2              THE VIDEOGRAPHER:  The time is 3:29 Pacific.

 3    We're off the record.

 4              (Recess.)

 5              THE VIDEOGRAPHER:  The time is 3:45 p.m.        03:45:45

 6    Pacific.  We are on the order.

 7              MR. PARSEGHIAN:  Let's mark as Exhibit 132 a

 8    letter dated March 29, 2022 Bates numbered XU00010 to

 9    15.  How many pages do you have there?

10              MS. SCHRATZ:  We only have two.

11              (Off-the-record discussion.)

12              (Defendants' Exhibit 132 marked.)

13    BY MR. PARSEGHIAN:

14        Q.   Okay.  Great.  Mr. Xu, have you seen

15    Exhibit 132 before?                                        03:47:33

16        A.   The first two pages I have seen before.  Let me

17    see the rest.  This is the same thing.  Yeah, this is

18    the e-mail.  Yeah, I saw this before.  Yeah, we saw

19    earlier today.

20        Q.   You've seen Exhibit 132 including all of the     03:48:08

21    pages, all of the attachments before today?

22        A.   I saw the first two pages before today, yeah.

23    The third page, the fourth page before today, but not

24    the 14 and 15.

25        Q.   And did you receive a FedEx from Better          03:48:35
```

96

1    Mortgage with this letter, Exhibit 132?

2         A.   You mean which page?

3         Q.   The exhibit, the letter, did you get this by

4    FedEx?

5         A.   No, I don't think so.                        03:48:55

6         Q.   So you see that it says underneath the date

7    "via Federal Express"?  But you don't remember getting

8    this by Federal Express?

9         A.   Yeah, I do not remember the way I got it.

10        Q.   But you do remember getting a letter from Juan  03:49:22

11   Arciniegas at Better Mortgage?  You remember getting the

12   letter?

13        A.   Yeah, I remember I got response from Better

14   Mortgage.  Yes.

15        Q.   And this is the response to the complaint you  03:49:39

16   submitted to the California Department of Financial

17   Protection; correct?

18        A.   Correct.

19        Q.   So Better Mortgage did respond to your

20   complaint?                                             03:49:51

21        A.   Right.

22             (Defendants' Exhibit 133 marked.)

23   BY MR. PARSEGHIAN:

24        Q.   And then if you take a look at Exhibit 133.

25             MR. PARSEGHIAN:  I'm sorry.  Exhibit 133 we'll  03:50:11

97

1   mark it as e-mail Bates XU00002.

2          THE WITNESS:  Yes.

3   BY MR. PARSEGHIAN:

4      Q.   And this is an e-mail that you sent to Better

5   Mortgage to Juan Arciniegas again in response to        03:50:27

6   Exhibit 132; correct?

7      A.   Correct.

8      Q.   And you told him that you would -- received a

9   response via mail?

10     A.   Okay, uh-huh.                                   03:50:54

11     Q.   And then you say, Thanks for taking your time

12  to go through my case.

13     A.   Hmm-mmm.

14     Q.   And then you say, Unfortunately, I still can't

15  agree with your decision.                               03:51:09

16     A.   Right.

17     Q.   So did you have any contact with anyone at

18  Better Mortgage about your dispute other than the loan

19  officer and Juan Arciniegas?

20          MR. MILDE:  Objection.  Asked and answered.    03:51:26

21          You can go ahead and answer it again.

22          THE WITNESS:  I do not have any records for the

23  other through customer service.  I don't have any

24  records of those.

25  ////                                                    03:51:45

                                                                    98

1    BY MR. PARSEGHIAN:

2        Q.   So the customer service telephone calls, did

3    you make any of those specifically to Better Mortgage?

4        A.   Yes.

5        Q.   Okay.  So you spoke with other people at Better    03:51:54

6    Mortgage but you don't remember who they were?

7        A.   Right.

8        Q.   Did you have any correspondence, either by

9    letter or by e-mail, with anyone other than Juan?

10        A.   The initial loan officer.                          03:52:19

11        Q.   Did you have any correspondence with anyone at

12    Better Mortgage other than the loan officer and Juan

13    regarding your dispute?

14        A.   No, I don't think so.

15        Q.   Did you have any communication with anyone at    03:52:36

16    Better Mortgage about your dispute after you sent this

17    e-mail on April 1, 2022, Exhibit 133?

18        A.   I don't remember.  I don't remember whether I

19    make another call or not.

20            MR. PARSEGHIAN:  Let's mark as Exhibit 134 a      03:54:12

21    document Bates numbers BMC000824 to 834.

22            (Defendants' Exhibit 134 marked.)

23            THE WITNESS:  Yes.

24    BY MR. PARSEGHIAN:

25        Q.   And Exhibit 134 is your record of account for    03:54:29

                                                                    99

November 22, 2024

```
 1    tax year 2020 with the Internal Revenue Service; is that

 2    right?

 3         A.   Yes.

 4         Q.   And you provided Better Mortgage with a form

 5    that allowed them to get this record of account from the   03:54:44

 6    IRS as part of your loan application; right?

 7         A.   Okay.

 8         Q.   If you take a look at page numbered 000825, you

 9    had a penalty for not prepaying tax for that tax year;

10    correct?                                                   03:55:21

11         A.   Okay.  Hmm-mmm.

12         Q.   And you had a penalty in 2020 for not prepaying

13    your taxes; right?

14         A.   I do not remember.  But now I see it on this

15    record.                                                    03:55:58

16         Q.   When you see this record do you remember that

17    you had a tax penalty in 2020?

18         A.   I still do not remember if this for the

19    property tax or my income tax.  I can't remember this

20    penalty.                                                   03:56:18

21              MR. PARSEGHIAN:  Okay.  Can we take a pause

22    here and check on the exhibits?

23              THE VIDEOGRAPHER:  The time is 3:56 p.m.

24    Pacific.  We are off the record.

25              (Recess.)                                        03:57:15
```

                                                                    100

```
 1              THE VIDEOGRAPHER:  The time is 4:17 p.m.

 2    Pacific.  We are on the record.

 3    BY MR. PARSEGHIAN:

 4        Q.  Mr. Xu, would you please take a look at --

 5    sorry.                                          04:17:56

 6              MR. PARSEGHIAN:  Let's mark as Exhibit 135, a

 7    two-page document.  It's secured property tax bill for

 8    July 1, 2018 to June 30, 2019.

 9              (Defendants' Exhibit 135 marked.)

10    BY MR. PARSEGHIAN:

11        Q.  You had an opportunity to review Exhibit 135?

12        A.  Yes.

13        Q.  And this is a tax bill for the property you own

14    at 99 East Middlefield Road in Mountain View; correct?

15        A.  Correct.                               04:18:23

16        Q.  And you were delinquent on your taxes in 2018

17    for this property; correct?

18        A.  Correct.

19        Q.  And did you receive this tax bill by mail or by

20    some other means?                              04:18:36

21        A.  I believe by mail.

22        Q.  And it was mailed to the 99 East Middlefield

23    Road address?

24        A.  Right.

25        Q.  And you received mail at that address at the   04:18:53
```

                                                                    101

1    time; correct?

2            MR. MILDE:  What's the date of this document?

3    Is there a date showing when this document was sent?

4            MR. PARSEGHIAN:  That wasn't my question.

5            MR. MILDE:  Well, it was your question because    04:19:23

6    you asked at this time, so that would require us to know

7    what the time was.

8            MR. PARSEGHIAN:  Okay.  That's fine.  I'll

9    withdraw the question.

10           Let's mark as Exhibit 136 a one-page document    04:19:33

11   that's Tax Collection and Apportionment System Bill

12   ID5182062.

13           (Defendants' Exhibit 136 marked.)

14           THE WITNESS:  Hmm-mmm.

15   BY MR. PARSEGHIAN:                                      04:19:51

16      Q.   So this shows that you paid the past due

17   payment a little over a month later on January 27, 2019;

18   correct?

19      A.   Hmm-mmm.

20      Q.   And you made that payment by electronic check?    04:20:06

21      A.   Hmm-mmm.

22      Q.   And you paid a penalty for the payment being

23   late; correct?

24      A.   Correct.

25           (Defendants' Exhibit 137 marked.)

                                                                    102

```
 1    BY MR. PARSEGHIAN:

 2          MR. PARSEGHIAN:  Let's mark as Exhibit 137 a

 3    supplemental property tax bill for May 5, 2021 through

 4    June 30, 2021.  And this is a property tax bill for your

 5    property, the home you live in at 3637 Ramona Street in    04:20:33

 6    Palo Alto; correct?

 7          A.   Hmm-mmm.

 8          Q.   And you were delinquent on your property tax

 9    payment for that property as well; right?

10          A.   Hmm-mmm.                                          04:20:50

11          Q.   How did you receive this property tax bill?

12          A.   I do not remember exactly.  But it should be

13    mail.

14          Q.   By mail to the address at 3637 Ramona Street?

15          A.   Hmm-mmm.                                          04:21:05

16          Q.   And why were you delinquent on this payment?

17          A.   I just did not remember to make the payment.

18          Q.   And for this property tax bill you were

19    delinquent on both of these payments; correct?

20          A.   Sorry.  Can you repeat your question?            04:21:27

21          Q.   Take a look at the second page of Exhibit 137

22    and in the upper right corner it says "Installment 1"

23    and then "Installment 2."  Do you see that?

24          A.   Yes.

25          Q.   And both Installment 1 and Installment 2 were    04:21:48
```

103

1    delinquent; correct?

2        A.    Correct.

3        Q.    But you were late on two property tax payments

4    for this property for this tax year?

5            MR. MILDE:  Wait a minute, Counsel.  There's --  04:22:01

6            MR. PARSEGHIAN:  Counsel, I'm asking the

7    question.  He can answer the question or not answer the

8    question if he can.

9            MR. MILDE:  Just give the witness a chance to

10   read the document.                                    04:22:18

11           MR. PARSEGHIAN:  Absolutely.

12           THE WITNESS:  What's your question?  Can you

13   repeat?

14   BY MR. PARSEGHIAN:

15       Q.    So both of your installments were delinquent    04:23:20

16   for this tax year 2022-2023; correct?

17       A.    I don't know why there are two installments.

18   But the first installment total amount is zero.  The

19   second one is 403.

20       Q.    The first installment amount shows a delinquent  04:23:55

21   penalty and a delinquent cost; correct?

22       A.    Hmm-mmm.

23       Q.    And the second installment shows another

24   delinquent penalty and delinquent cost; correct?

25       A.    Yes.                                          04:24:10

104

```
 1              (Defendants' Exhibit 138 marked.)

 2    BY MR. PARSEGHIAN:

 3        Q.   Why don't we take a look at Exhibit 138.  And

 4    this is the Tax Collection and Apportionment System Bill

 5    ID 7524359.  We'll mark that as Exhibit 138.  And that's    04:24:33

 6    for the same bill that we were just looking at; correct?

 7        A.   Correct.

 8        Q.   And it shows for Installment 1 that the

 9    delinquency date was February 8, 2022.

10        A.   Hmm-mmm.                                           04:24:54

11        Q.   And the payment date was March 2, 2022;

12    correct?

13        A.   Hmm-mmm.

14        Q.   So that first installment was delinquent and

15    you paid a penalty for that; right?                        04:25:05

16        A.   Hmm-mmm.

17        Q.   And then the system installment the delinquency

18    date was June 30, 2022 and you didn't pay it until

19    August 23rd of 2022; correct?

20        A.   Hmm-mmm.                                           04:25:20

21        Q.   And, again, you paid a delinquency penalty for

22    that installment?

23        A.   Hmm-Hmm.

24        Q.   And what was the reason that these installments

25    were late?                                                 04:25:31
```

                                                                    105

1        A.   I just forgot.

2             MR. PARSEGHIAN.  And let's mark as Exhibit 139

3    supplemental property tax bill for July 1, 2021 through

4    June 30, 2022.

5             (Defendants' Exhibit 139 marked.)

6    BY MR. PARSEGHIAN

7        Q.   And this is, again, for your 3637 Ramona Street

8    home in Palo Alto; correct?

9        A.   Hmm-mmm.

10       Q.   And both of the payments for this tax period      04:25:59

11   were delinquent as well?

12       A.   Correct, hmm-mmm.

13       Q.   And you received this tax bill by mail?

14       A.   Yes, I believe so.

15       Q.   By mail, it's your 3637 Ramona Street address?   04:26:20

16       A.   Yes, hmm-mmm.

17            MR. PARSEGHIAN:  And let's mark as Exhibit 140

18   Tax Collection and Apportionment System Bill ID 7524360.

19            (Defendants' Exhibit 140 marked.)

20            THE WITNESS:  Hmm-mmm.                            04:26:40

21   BY MR. PARSEGHIAN:

22       Q.   And this is the payment history for the same

23   bill we were just looking at, Exhibit 139; correct?

24       A.   Hmm-mmm.

25       Q.   And it shows that Installment 1 was due on        04:26:47

                                                                    106

1    February 28, 2022 and you paid it late on March 2, 2022;

2    correct?

3        A.   Correct.

4        Q.   And you paid a penalty associated with that

5    installment for it being late?                          04:27:00

6        A.   Hmm-mmm.

7        Q.   Then the second installment was due on

8    June 30, 2022 and you didn't pay it until

9    August 23, 2022?

10       A.   Hmm-mmm.                                        04:27:15

11       Q.   And, again, you paid a penalty for that

12   installment being late; correct?

13       A.   Hmm-mmm.

14       Q.   And what was the reason that these payments,

15   for the Ramona Street property were not paid on time?   04:27:26

16       A.   I forgot.

17       Q.   Other than the disputes that you made to the

18   credit reporting agencies and the complaint that you

19   made to the California Department of Financial

20   Protection did you make any other complaints or disputes 04:28:05

21   regarding the missed payment that's the subject of this

22   case to any other government agencies or outside

23   agencies besides the ones we discussed?

24       A.   I don't remember anything else.

25       Q.   Those are all my questions right now.  I may   04:28:44

                                                             107

```
 1    have some follow-up.  Thank you very much.

 2        A.   Thank you.

 3             FURTHER EXAMINATION BY MS. SCHRATZ

 4        Q.   I have some just very brief questions.

 5             Do you believe that The Money Source failed to    04:29:06

 6    conduct a reasonable investigation into your credit

 7    reporting dispute?

 8             MR. MILDE:  Objection.  Calls for a legal

 9    conclusion.  That's an improper contention question.

10    It's a question that's not appropriate for deposition.    04:29:18

11    Instruct the witness not to answer.

12    BY MS. SCHRATZ:

13        Q.   Do you believe that The Money Source was

14    required to remove this delinquency from your credit

15    report?                                                   04:29:35

16             MR. MILDE:  Same objection.  Same instruction.

17    BY MS. SCHRATZ:

18        Q.   Are you going to following the instruction as

19    to those two questions?

20        A.   Yes.

21        Q.   Are you personally aware of any other instances

22    where you believe that the Money Source has wrongfully

23    reported credit information other than for the dispute

24    we've discussed today?

25        A.   No.                                              04:30:21
```

108

1      Q.   At any time did you ask to set up automatic

2   payments through Chase, your personnel banking account,

3   to pay The Money Source regarding this loan?

4      A.   No.

5      Q.   Why not?                                        04:30:47

6      A.   The auto payment is supposed to be set up on

7   the lender's side, not from my bank.

8      Q.   That's all I have.  Thank you.

9           THE VIDEOGRAPHER:  Would you like your video

10   synched?                                               04:31:25

11          MS. SCHRATZ:  Berj, did you have anything else?

12          MR. PARSEGHIAN:  No.

13          MS. SCHRATZ:  Did you want to make any

14   comments?

15          MR. MILDE:  No.                                 04:31:31

16          THE VIDEOGRAPHER:  Would you like your video

17   synched?  I need to get it on the record.

18          MS. SCHRATZ:  Yeah, I'll take everything.

19          THE VIDEOGRAPHER:  Would you like a video

20   order?                                                 04:31:43

21          MR. MILDE:  No thanks.

22          THE VIDEOGRAPHER:  Berj, would you like a video

23   order?

24          MR. PARSEGHIAN:  Not a video order, no thanks.

25   Transcript.                                            04:31:50

                                                              109

1          THE REPORTER:  Copy orders?

2          MR. MILDE:  Yes.

3          THE REPORTER:  Berj, do you want a transcript?

4          MR. PARSEGHIAN:  Yes, please.

5          THE VIDEOGRAPHER:  This ends Volume 1 of the     04:31:55

6    video deposition of Jing Xu in the matter of Jing Xu

7    versus Better Mortgage Corporation.  The time is 4:31,

8    Pacific.  We're off the record.

9    (Whereupon, the deposition of JING XU concluded at

10   4:31 p.m.)

11                       ---o0o---

12                       DECLARATION

13         I declare under penalty of perjury that the

14   foregoing is true and correct.  Subscribed at

15   _____, California, this ____ day of _____ 2024.

16

17         _____

18                       JING XU

19

20

21

22

23

24

25

                                                          110

```
 1                    CERTIFICATE OF REPORTER

 2         I, KATHRYN M. CHARPENTIER, a Certified Shorthand

 3    Reporter, hereby certify that the witness in the

 4    foregoing deposition was by me duly sworn to tell the

 5    truth, the whole truth, and nothing but the  truth in

 6    the within-entitled cause;

 7         That said deposition was taken in shorthand by me,

 8    a disinterested person, at the time and place therein

 9    stated, and that the testimony of  the said witness was

10    thereafter reduced to typewriting, by computer, under my

11    direction and supervision;

12         That before completion of the deposition, review of

13    the transcript [X] was [ ] was not requested.  If

14    requested, any changes made by the deponent (and

15    provided to the reporter) during the period allowed are

16    appended hereto.

17         I further certify that I am not of counsel or

18    attorney for either or any of the parties to the  said

19    deposition, nor in any way interested in the  event of

20    this cause, and that I am not related to any of the

21    parties thereto.

22

23    DATED:  Wednesday, December 18, 2024

24

25    _____
```

111

```
1                              ERRATA SHEET

2

3       If any corrections to your proceeding are necessary,
        indicate them on this sheet, giving the change, page
4       number, line number and reason for change.

5       PAGE  LINE  FROM                  TO

6       ____  ____  _____    _____

7       Reason  _____

8       ____  ____  _____    _____

9       Reason  _____

10      ____  ____  _____    _____

11      Reason  _____

12      ____  ____  _____    _____

13      Reason  _____

14      ____  ____  _____    _____

15      Reason  _____

16      ____  ____  _____    _____

17      Reason  _____

18      ____  ____  _____    _____

19      Reason  _____

20      ____  ____  _____    _____

21      Reason  _____

22      ____  ____  _____    _____

23      Reason  _____

24      _____    _____

25      Signature                         Date

                                                            112
```